UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SMART WORLD TECHNOLOGIES, LLC, et al., | Bankruptcy Court Case Nos. 00-41645 through 00-41647 (JMP) |
| Debtors. | (Substantively Consolidated) |
| RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP, | District Court Case No. 07 cv 03603 (MGC) |
| Appellant, | |
| vs. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, et al., | |
| Appellee. | |

APPELLANT'S BRIEF FOR (I) REVERSAL OF ORDER ALLOWING FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES DATED MARCH 23, 2007, AND ENTERED ON MARCH 28, 2007 AND (II) ALLOWANCE OF FEES PURSUANT TO CONTINGENCY FEE AGREEMENT APPROVED UNDER 11 U.S.C § 328(a)

Of Counsel:

Glenn D. Curving (GC-3464)
J. Alex Kress (JK-7189)

On the Brief:

Seth H. Lieberman (SL-4880)

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800
-and-
500 Fifth Avenue
New York, NY 10110
(212) 302-6574

*Pro se*, for services rendered as Special Litigation Counsel to Debtors and Debtors-in-Possession, Smart World Technologies, LLC, Freewwweb, LLC and Smart World Communications, Inc.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii
PRELIMINARY STATEMENT ........................................................................... ii
STATEMENT OF APPELLATE JURISDICTION........................................... 2
STANDARD OF REVIEW ................................................................................. 2
STATEMENT OF THE CASE ............................................................................ 3
STATEMENT OF FACTS................................................................................... 6
LEGAL ARGUMENT ....................................................................................... 18
I.   THE BANKRUPTCY COURT ONLY COULD ALTER RIKER DANZIG'S
     PRE-APPROVED CONTINGENCY FEE ARRANGEMENT IF IT WAS
     "IMPROVIDENT" BASED ON "DEVELOPMENTS NOT CAPABLE OF
     BEING ANTICIPATED." ......................................................................... 18
 A.  Bankruptcy Code § 328(a) Requires Both "Improvidence" and Unforeseeable
     Events. ......................................................................................................... 18
 B.  "Improvident" is a Heightened Determination Which Rarely is Met. .................... 19
 C.  "Not Capable of Being Anticipated" Adds Another High Hurdle Which Goes
     Beyond Merely "Unanticipated" or "Unforeseen."............................................. 19
 D.  It is Inappropriate to Employ a Retrospective Reasonableness Analysis Absent a
     Finding of "Improvidence" and "Unforeseeability." .......................................... 21
II.  ALL OF THE FACTORS CITED BY THE BANKRUPTCY COURT COULD
     HAVE BEEN ANTICIPATED WHEN RIKER DANZIG'S CONTINGENCY
     FEE RETENTION WAS APPROVED.................................................... 23
 A.  Riker Danzig Foreseeably and Properly Pursued the Appeal. ................................ 23
 B.  Riker Danzig Foreseeably and Properly Conducted the Litigation After Completing
     the Appeal. ................................................................................................... 25
  1.  The Debtors Complied With the Discovery Schedule........................................ 25
  2.  The Debtors' Participation in the Confirmation Process was Appropriate. .......... 26
 C.  Any Antagonism Did Not Involve Counsel and was Foreseeable in Any Case....... 27
 D.  Riker Danzig Foreseeably and Properly Followed the Direction of the Debtors'
     Principal Officers. .......................................................................................... 29
III. IN REDUCING RIKER DANZIG'S FEE, THE BANKRUPTCY COURT
     NOT ONLY IGNORED BANKRUPTCY CODE § 328(a), BUT CONGRESS'
     INTENT AND SOUND BANKRUPTCY POLICY. ............................... 33
 A.  Modifying Riker Danzig's Fee Arrangement is Contrary to Congress' Intent. ....... 33
 B.  Modifying Riker Danzig's Fee Arrangement Has Negative Policy Implications. ... 35
IV.  ALTHOUGH IT ERRED IN MODIFYING RIKER DANZIG'S FEE
     AWARD, THE BANKRUPTCY COURT CORRECTLY HELD THAT
     RIKER DANZIG'S CONTINGENCY FEE ARRANGEMENT WAS PRE-
     APPROVED UNDER BANKRUPTCY CODE § 328(a)....................... 36
 A.  Bankruptcy Courts Can Retain Counsel on Special Terms. .................................. 36
 B.  Riker Danzig's Revised Contingency Proposal was Pre-Approved Pursuant to 11
     U.S.C. § 328................................................................................................... 37
 C.  The Bankruptcy Court Correctly Determined That Riker Danzig was Pre-Approved
     Based on the Revised Contingency Fee Proposal................................................. 39
CONCLUSION ................................................................................................. 41

# TABLE OF AUTHORITIES

## CASES

Ams. United for Separation of Church & State v. Prison Fellowship Ministries,
432 F. Supp. 2d 862 (S.D. Iowa 2006) ................................................... 24

In re Atlas Automation, Inc.,
27 B.R. 820 (Bankr. E.D. Mich. 1983) ............................................. 33, 34

In re Confections by Sandra, Inc.,
83 B.R. 729 (B.A.P. 9th Cir. 1987) ........................................................ 20

In re Cosmopolitan Shipping Co.,
No. 77 Civ. 1425, 1978 U.S. Dist. LEXIS 7019 (S.D.N.Y. Dec. 26,
1978) ................................................................................................... 34

Cox v. Via,
No. 95-3160, 1995 U.S. Dist. LEXIS 14914 (E.D. Pa. Oct. 13,
1995) ................................................................................................... 24

Daniels v. Barron (In re Barron),
325 F.3d 690 (5th Cir. 2003) ................................................................. 20

Falke, Inc. v. Cafritz Co. (In re Falke, Inc.),
Adv. Pro. No. 05-1488, 2006 Bankr. LEXIS 2814 (Bankr. E.D. Va.
June 14, 2006) ..................................................................................... 23

In re Frank Fehr Brewing Co.,
268 F.2d 170 (6th Cir. 1959) ................................................................. 28

Goldfine v. Sichenzia,
118 F. Supp. 2d 392 (S.D.N.Y. 2000) ................................................... 31

Hansen, Jones & Leta, P.C. v. Segal,
220 B.R. 434 (D. Utah 1998) ................................................................. 29

In re High Voltage Eng'g Corp.,
311 B.R. 320 (Bankr. D. Mass. 2004) ................................................... 21

In re Hunt's Health Care, Inc.,
161 B.R. 971 (Bankr. N.D. Ind. 1993) ................................................... 33

In re Labelon Corp.,
No. 02-22582, 2006 Bankr. LEXIS 649 (Bankr. W.D.N.Y. Mar. 24,
2006) ................................................................................................... 34

Marro v. Adamski & Conti,
  No. 97 C 8805, 1998 U.S. Dist. LEXIS 15731 (N.D. Ill. Sept. 25,
  1998) ................................................................................................ 29

In re Marsico,
  No. 01-12120-JMD, 2004 Bankr. LEXIS 43 (Bankr. D.N.H. Jan. 5,
  2004) ................................................................................................ 28

In re Marvel Entm't Group,
  140 F.3d 463 (3d Cir. 1998) ............................................................ 28

Estate of Messina v. Berney (In re Messina),
  No. 99 B 29371, 2003 Bankr. LEXIS 1245 (Bankr. N.D. Ill. Sept.
  29, 2003) ........................................................................................... 28

Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio),
  91 F.3d 296 (2d Cir. 1996) ................................................................ 2

Nelson v. Ipalco Enters., Inc., No. IP02-0477-C-H/K,
  2005 U.S. Dist. LEXIS 16909 (S.D. Ind. Aug. 11, 2005) ........................ 24

Nischwitz v. Miskovic (In re Airspect Air, Inc.),
  288 B.R. 464 (B.A.P. 6th Cir. 2003) .................................................... 18

Nischwitz v. Miskovic (In re Airspect Air, Inc.),
  385 F.3d 915 (6th Cir. 2004) ............................................................ 21

Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't
  Group),
  209 B.R. 832 (D. Del. 1997) ............................................................ 30

Official Comm. of Unsecured Creditors of Qualitech Steel Corp. v. Bank Group
  (In re Qualitech Steel Corp.),
  No. IP 00-496-C H/G, 2001 U.S. Dist. LEXIS 11768 (S.D. Ind. Jul.
  5, 2001), aff'd, In re Qualitech Steel Corp., 276 F.3d 245 (7th Cir.
  2001) ................................................................................................ 28

In re Olympic Marine Servs., Inc.,
  186 B.R. 651 (Bankr. E.D. Va. 1995) .................................................. 21

In re Parmalat Sec. Litig.,
  04 MD 1653 (LAK), 2007 U.S. Dist. LEXIS 20785 (S.D.N.Y. Mar.
  23, 2007) ........................................................................................... 31

In re Poseidon Pools of Am.,
  216 B.R. 98 (E.D.N.Y. 1997) .............................................................. 2

iii

Refrigerant Reclamation Corp. of Am. v. Todack (In re Refrigerant Reclamation
       Corp. of Am.),
       186 B.R. 78 (Bankr. M.D. Tenn. 1995) ................................................... 28

Robson, Miller & Oseserman v. D.H. Overmyer Telecasting Co. (In re D.H.
       Overmyer Telecasting Co.),
       77 B.R. 128 (Bankr. N.D. Ohio 1987) .................................................... 30

Sampson v. Sampson,
       142 B.R. 957 (D. Colo. 1992) ............................................................... 24

Seiler v. First Nat'l Bank (In re Benassi),
       72 B.R. 44 (D. Minn. 1987) ............................................................ 20, 33

In re Smart World Technologies, LLC,
       423 F.3d 166 (2d Cir. 2005) ......................................................... *passim*

In re Spanjer Bros., Inc.,
       191 B.R. 738 (Bankr. N.D. Ill. 1996) .................................................... 29

Travellers Int'l, AG v. TWA (In re TWA),
       134 F.3d 188 (3d Cir. 1998) ................................................................. 28

United States v. Levy,
       992 F.2d 1081 (10th Cir. 1993)............................................................. 30

United States v. Monnat,
       853 F. Supp. 1304 (D. Kan. 1994) ........................................................ 29

United States v. Wallach,
       935 F.2d 445 (2d Cir. 1991) ................................................................. 31

Unsecured Creditors Comm. v. Webb & Daniel,
       204 B.R. 830 (Bankr. M.D. Ga. 1997)............................................... 18, 20

In re Warrior Drilling & Eng'g Co.,
       9 B.R. 841 (Bankr. N.D. Ala. 1981) ...................................................... 33

Willemijn Houdstermaatschaapij BV v. Apollo Computer,
       707 F. Supp. 1429 (D. Del. 1989) ......................................................... 23

Wisecarver v. Moore,
       No. 1:05-CV-194-R, 2006 U.S. Dist. LEXIS 49664 (W.D. Ky. July
       19, 2006)............................................................................................. 23

iv

In re XO Commc'ns, Inc.,
      323 B.R. 330 (Bankr. S.D.N.Y. 2005) .................................................. 19

## STATUTES

11 U.S.C. § 327  ................................................................................. 36

11 U.S.C. § 328  ........................................................................... *passim*

11 U.S.C. § 330  .......................................................................... 21, 36

28 U.S.C. § 158(a) ................................................................................ 2

Fed. R. Bankr. P. 8013 ........................................................................ 2

## MISCELLANEOUS

124 Cong. Rec. H 11 (Sept. 28, 1978); S 17 (Oct. 6, 1978) ......................... 34

Black's Law Dictionary (8th ed. 1999)................................................... 19

H.R. Rep. No. 95-989, 95th Cong., 2d Sess. (1978), as reprinted in U.S.C.C.A.N.
      5787 ................................................................................................ 34

N.Y. Code of Prof'l Responsibility DR 7-102(A)(7) (2007)......................... 29

Robert J. Landry, III & James R. Higdon, A Primer on 11 U.S.C. 328(a) and its
      Use in Alternative Methods in Bankruptcy, 50 Mercer L. Rev. 537
      (1999) ............................................................................................. 20

      

## PRELIMINARY STATEMENT

Riker Danzig Scherer Hyland & Perretti LLP, which was approved as special litigation counsel to the debtors herein on a contingency fee basis, seeks reversal of the bankruptcy court order which reduced its fee claim to just over one half the amount due it under its agreed and approved fee arrangement.  In reducing Riker Danzig's fees, the bankruptcy court acknowledged that Riker Danzig's contingency fee arrangement could be revisited only if its terms were "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).  But, the bankruptcy court committed legal error in misapplying that standard to the facts of this case.

None of the factors cited by the bankruptcy court -- Riker Danzig's successful appeal of an initial settlement in the case, Riker Danzig's prosecution of the case after the appeal, Riker Danzig's adherence to its client's directions throughout the case and the disagreements between the debtors and their creditors over the prosecution of the claims Riker Danzig was retained to handle -- were unforeseeable.  In addition, none of the factors cited by the bankruptcy court reach the heightened standard of demonstrating that the initial terms of Riker Danzig's retention were improvident.

The Committee's cross-appeal contending that Riker Danzig was not retained as contingency fee counsel lacks any merit.  The record of the proceedings on Riker Danzig's retention, as well as the pleadings and order entered in connection with those proceedings, indisputably support the finding that Riker Danzig was employed on a contingency fee basis.

1

## STATEMENT OF APPELLATE JURISDICTION

The order appealed from is a final order of the United States Bankruptcy Court for the Southern District of New York.  See, e.g., In re Poseidon Pools of Am., 216 B.R. 98, 99 (E.D.N.Y. 1997) (permitting an appeal of a final fee order under 28 U.S.C. § 158(a), "which provides for appellate jurisdiction in the district courts from 'final judgments, orders, and decrees . . . of bankruptcy judges.'").  As such, it is appealable as of right.  This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 158(a).

## STANDARD OF REVIEW

This Court reviews the bankruptcy court's legal determinations *de novo*. See, e.g., Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio), 91 F.3d 296, 300 (2d Cir. 1996) (citing Fed. R. Bankr. P. 8013).  It reviews the bankruptcy court's factual conclusions for clear error.  See id. (citing same).  Accordingly, the bankruptcy court's determination that Riker Danzig was retained on a contingency fee basis is subject to a "clearly erroneous" standard, but its determination that Riker Danzig's approved fee agreement could be modified under the standard established in 11 U.S.C. § 328(a) is reviewable *de novo*.

## STATEMENT OF THE CASE

These appeals arise from an Order Allowing Final Compensation and Reimbursement of Expenses and Disbursements (the "Final Fee Order") entered by The Hon. James M. Peck, U.S.B.J. ("Judge Peck").  In particular, Riker Danzig appeals from Judge Peck's reduction of its requested fees and expenses from the $2,399,448.15 due to it in accordance with its approved contingency fee arrangement to $1,281,787.18.

Riker Danzig was retained as special litigation counsel to the debtors and debtors-in-possession herein, Smart World Technologies, LLC, Freewwweb, LLC and Smart World Communications, Inc. (collectively, "Debtors" or "Smart World"), by an Order Authorizing and Approving Debtors-in-Possession's Retention of Special Litigation Counsel (the "Retention Order") entered by The Hon. Cornelius Blackshear, U.S.B.J. ("Judge Blackshear"), who presided over this matter from the Debtors' filings on June 29, 2000, until his retirement from the bench in March 2005.  The Retention Order specifically approved a contingency fee on a sliding scale based on amounts obtained from Juno Online Services, Inc. ("Juno"), which had purchased (but refused to pay for) substantially all of the Debtors' assets from the Debtors in a post-bankruptcy sale under 11 U.S.C. § 363(b).

Juno had filed an initial complaint against the Debtors on August 16, 2000, and an amended complaint on August 21, 2000, seeking declaratory judgment regarding Juno's obligations to the Debtors (including its obligation to pay the Debtors for the assets it acquired) and seeking monetary damages from the Debtors.

At the time Riker Danzig was retained, the Debtors had no resources to pay for Riker Danzig's services to defend itself.  Although these claims ultimately

brought the Debtors' bankruptcy estates $6,500,000, at the outset of the case, when the Debtors' recovery was uncertain, neither the Debtors' general bankruptcy counsel, nor counsel to the creditors' committee appointed in this case, were willing or able to invest the time and expenses needed to represent the Debtors in handling these disputes.  Yet, the Debtors' claims against Juno were the principal (if not the sole) hope for any recovery by the Debtors and their creditors.

Riker Danzig represented the Debtors with respect to these claims for over six years, including initial discovery efforts, preliminary settlement discussions, repeated stays of discovery and attempts to move forward with discovery, mediation, settlement disputes and resulting appeals.  Its efforts included a successful appeal to the United States Court of Appeals for the Second Circuit (In re Smart World Technologies, LLC, 423 F.3d 166 (2d Cir. 2005)) and substantial discovery and investigation following the appeal.

Following these numerous proceedings, Juno paid $6,500,000 (the "Settlement Payment") pursuant to a settlement which was incorporated into and approved in the Amended Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code for the Substantively Consolidated Debtors Smartworld [sic] Technologies, LLC, Freewwweb, LLC and Smartworld [sic] Communications, Inc. Dated as of October 16, 2006 (the "Plan").  The Plan was confirmed at a hearing held on December 21, 2006, and approved in the Order Confirming Amended Chapter 11 Plan entered on December 27, 2006 (the "Confirmation Order").

After entry of the Confirmation Order, Riker Danzig filed an application for payment of its fees in accordance with its court-approved contingency fee

arrangement.  Various parties objected to Riker Danzig's fees.  Following a hearing at which Judge Peck took argument regarding Riker Danzig's fees, and a separate hearing at which he read his decision with respect to Riker Danzig's application into the record, Judge Peck entered the Final Fee Order.

Following entry of the Final Fee Order, Riker Danzig filed its Notice of Appeal of the Final Fee Order (the "Notice of Appeal") on April 2, 2007.  The Committee filed its Notice of Cross-Appeal of the Final Fee Order (the "Notice of Cross-Appeal") on April 4, 2007.

## STATEMENT OF FACTS

**A.    The Debtors' Bankruptcy Cases.**

On June 29, 2000 (the "Petition Date"), the Debtors each filed voluntary petitions for relief commencing their cases for reorganization under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). See Joint Appendix ("J.A.") A-1410. Initially, the Debtors sought to retain Douglas J. Pick & Associates and The Law Offices of Douglas T. Tabachnik as their general bankruptcy counsel. See id. The Bankruptcy Court only permitted Mr. Pick's firm to serve for an initial 30-day period. See id. Thereafter, Mr. Tabachnik (a solo practitioner) was the Debtors' sole bankruptcy counsel. See id.

On July 13, 2000, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors in the Debtors' bankruptcy cases (the "Committee"). See id. With the authority of the Bankruptcy Court, the Committee retained Angel & Frankel, P.C. as its bankruptcy counsel. (In January 2006, Angel & Frankel, P.C. merged with Cole, Schotz, Meisel, Forman & Leonard P.A. which became counsel to the Committee.) See id.

**B.    The Juno Sale.**

A principal purpose of the Debtors' bankruptcy filings was to consummate the sale of the Debtors' assets to Juno pursuant to a "Summary of Terms" dated June 29, 2000, with appended confirmation letter (the "Term Sheet"). See id. Consistent with the provisions of the Term Sheet, the Debtors filed the petitions and sought approval of the transaction it contemplated on an expedited basis. See id. Following

notice, the Bankruptcy Court authorized the sale of Smart World's subscribers to Juno on July 19, 2000 (the "Sale"). See id.

### C.    The Juno Disputes.

Less than one month after approval of the Sale, on August 16, 2000, Juno filed a complaint against the Debtors. See J.A. A-1411. On August 21, 2000, Juno amended its complaint and sought affirmative relief from the Debtors. See id.

As acknowledged in the Application of Debtors-in-Possession for an Order Approving Retention of Special Litigation Counsel, dated November 7, 2000 [Docket No. 151] (the "Retention Application"), J.A. A-1479 to A-1491, "Juno [took] the position that it will not pay the Debtors pursuant to the aforesaid sale, pending resolution of [the] dispute[s] between the Debtors and Juno." J.A. A-1481. Juno's position "depriv[ed] the debtors with [sic] any funds with which to actively protect their interests." See id.

As further acknowledged in the Retention Application, Juno's position immediately following the Sale and in the adversary proceeding it commenced demonstrated its intentions to employ "aggressive litigation tactics" including threatening sanctions against the Debtors' principal bankruptcy counsel. See id. In fact, neither the Debtors' principal bankruptcy counsel, nor the Committee's counsel, were in a position to take on the type of litigation which Juno already had engaged in, and seemed likely to continue to pursue, especially since the Debtors, in reliance on Juno's good faith and the Bankruptcy Court's approval of the Sale, already had transferred to Juno substantially all of their assets. See id.

### D.    The Debtors' Application to Retain Riker Danzig.

Against this backdrop, between August 2000 and October 2000, Riker Danzig negotiated with the Debtors (through their principal officers, Steven and Paula Daum), the Debtors' general bankruptcy counsel, Douglas T. Tabachnik, the Committee's counsel, Angel & Frankel, P.C., and counsel to WorldCom Network Services, Inc. ("WorldCom")[1] to defend Juno's complaint and to represent the Debtors in their disputes with Juno on a contingency fee basis.  See id. at A-1412.  These negotiations resulted in a contingency fee proposal memorialized in a letter from James S. Rothschild, Jr., Esq. to Douglas T. Tabachnik, Esq. dated October 31, 2000, which was submitted with the Retention Application (the "Filed Contingency Proposal").  See id. at A-1484 to A-1485.

As a result of objections by the U.S. Trustee and Juno, and after off-the-record discussions among the interested parties at the hearing on the Retention Application, Riker Danzig agreed to modify the Filed Contingency Proposal to accommodate some of the concerns raised.  See id. at A-1412-13.  This modified proposal was embodied in a letter from James S. Rothschild, Jr., Esq. to Douglas T. Tabachnik dated November 15, 2000 (the "Revised Contingency Proposal"), which specifically was approved by and referred to in the Retention Order.  See id. at A-1443 to A-1444.

The Filed Contingency Proposal and the Revised Contingency Proposal were carefully crafted to balance the incentives to Riker Danzig and the interests of the Debtors' estates.  See id. at A-1413.  Because the estates could not even cover the

---

[1] WorldCom initially held itself out as the Debtors' principal secured creditor.  It subsequently became the Committee's position that WorldCom did not have a perfected, secured claim.

expenses incurred in the litigation, Riker Danzig agreed to pay all expenses of the litigation with those expenses being paid first from any recovery.  See id.  Because certain parties believed that a quick settlement in a specific range was possible, the Filed Contingency Proposal and the Revised Contingency Proposal included a "base recovery" of $500,000 (one-third of the first $1,500,000 recovered after payment of the expenses) and a sliding scale for recoveries in the range of $1,500,000 to $8,000,000 depending on how long the litigation proceeded.  See id. at A-1443 to A-1444.

The Revised Contingency Proposal adjusted the sliding scale.  See id. While retaining the provision providing for payment of $500,000 of the first $1,500,000 recovered, it gave Riker Danzig no recovery from any amounts obtained between $1,500,000 and $8,000,000 if the litigation concluded in the first six months, only 10% of any amounts obtained in the range if the litigation continued for six to nine months, only 20% of this amount if the litigation continued for nine to twelve months and 37% of this amount if the litigation continued for more than twelve months.  See id.[2]

### E.    The Proceedings to Retain Riker Danzig as Contingency Fee Counsel.

Judge Blackshear conducted a hearing on the Retention Application and the objections of Juno and the U.S. Trustee on November 14, 2000 (the "Retention Hearing").  See J.A. No. 7.  At the Retention Hearing, counsel to WorldCom described to Judge Blackshear the terms of the Revised Contingency Proposal and how it effectively balanced the Committee's efforts to settle and Riker Danzig's efforts to litigate:

---

[2] The Revised Contingency Proposal also gave Riker Danzig 37% of any recovery over $8,000,000 if achieved in the first eighteen months, but its recovery from amounts over $8,000,000 was reduced to one-third if the litigation continued for more than eighteen months.  See id. at A-1414.  Since the settlement approved in the Plan was less than $8,000,000, these provisions are irrelevant here.  See id.

That settlement, that proposal is embodied in the papers that everybody has received. Their proposal said – was they got their expenses off the top because those expenses are the obligations of the Debtor and they'll be satisfied first thing from the proceeds.

Then out of the first million and a half they get a third. The purpose of that is to incentivize them to immediately get immersed in this case because we believe there are a lot of issues they'll face quickly during the holiday season. We want them in there immediately.

Out of the next $6.5 million, there is a staged in progression. They get nothing if there is a settlement within six months; however, they will have gotten the $500,000 from the first million and a half, so there is still incentive to go in and do something quickly. They could still make a very nice fee for themselves.

From six to nine months they get 20 percent [sic], 10 percent of that next thing and from nine months to 12 months they get twenty percent.

The proposal we submitted to the Court and the writing that everyone has says; thereafter they get forty percent whereas their previous proposal had been 37 percent because they're not risking not getting anything on that $6.5 million. It jumped up to forty percent.

We understood that Your Honor had a concern at the last hearing that this wasn't enough incentive for them to satisfy quickly and the U.S. Trustee had a concern that forty percent was too high, so we've continued to negotiate with them.

What we've done is we've changed what happens after the first $8 million with respect to any income after the first $8 million, they get thirty-seven percent above the $8 million, if it's in the first eighteen months and three-three percent thereafter.

We think that that layers in the incentive to do everything as quickly as possible and should meet everybody's concerns.

Retention Hrg. Tr. at 23:4-24:15; J.A. A-0064 to A-0065. All parties present at the

Retention Hearing recognized that under the terms of the Revised Contingency

10

Proposal, Riker Danzig was proposing to be pre-approved under the Bankruptcy Code.

See J.A. A-0069.[3]

> Judge Blackshear accepted these terms and approved them as reasonable:
>
> THE COURT:  The contingency fee . . . basically addresses the reasonableness . . . .
>
> *  *  *
>
> If he's willing to take that chance, on success being paid and unsucccess not getting anything, that to me addresses the reasonableness of his fee. . .
> *  *  *
> THE COURT:  I'm not going to review the time records of the individual merely because of the fact that he agreed to a contingency fee.

Retention Hrg. Tr. at 26:8-9; 26:18-21; 27:6-8; J.A. A-0067 to A-0069.

### F.    The Retention Order Approving and Incorporating the Revised Contingency Proposal.

The day after the Retention Hearing, Judge Blackshear entered the Retention Order, which specifically authorized the Debtors to retain Riker Danzig on the terms and conditions set forth in the Revised Contingency Proposal consistent with the understanding presented to him at the Retention Hearing:

> any and all compensation to be paid to Riker, Danzig, Scherer, Hyland & Perretti LLP for services rendered on behalf of the Debtors in the within Chapter 11 proceedings shall be fixed upon further application of this Court and shall be paid in accordance with the within application and the letter of James S. Rothschild, Jr., Esq., dated November 15, 2000 [i.e., the Revised Contingency Proposal].

---

[3] WorldCom's counsel clarified this point as follows:

> MS. MAYERSON [counsel to WorldCom]:  Your Honor, just to clarify.  [Riker Danzig's] fee application will be consistent with the contingency fee agreement and lay out what the proceeds were, et cetera, as opposed to the typical fee application?

Retention Hrg. Tr. at 28:5-8; J.A. A-0069.

Retention Order at p. 2, second decretal paragraph (emphasis added); J.A. A-0124. The Revised Contingency Proposal provided for Riker Danzig's payment on the sliding scale described by WorldCom's counsel:

> Riker Danzig will take the case in consideration of the following payment terms: 1) Riker Danzig will be paid all expenses off of the top any recovery and, after payment of expenses, will receive 33-1/3% of the first $1,500,000 obtained from Juno[4]; 2) Riker Danzig's share of funds in excess of $1,500,000 but less than $8 Million will be (a) 0% if the litigation lasts less than 6 months, (b) 10% if the litigation lasts from 6 months to 9 months, (c) 20% if the litigation lasts between 9 months and 12 months, (d) 37% if the litigation lasts more than 12 months; and 3) Riker Danzig will receive 37% of all funds received in excess of $8 Million.

Revised Contingency Proposal at ¶ 1 (footnote in original); J.A. A-1443 to A-1444.

### G.     The Proceedings After Riker Danzig's Retention.

At the Retention Hearing, Judge Blackshear established a deadline for the Debtors and their newly-retained special litigation counsel, Riker Danzig, to answer Juno's amended complaint and assert the Debtors' counterclaims. As directed by Judge Blackshear, on December 19, 2000, the Debtors filed their answer, affirmative defenses and counterclaims in response to Juno's amended complaint. See J.A. A-1415.

Contemporaneously with filing the Debtor's answer and counterclaims, Riker Danzig prepared and served discovery requests on Juno including document requests and interrogatories. See id. Riker Danzig even began review of Juno's records at Juno's counsel's offices. See id. But progress in the Adversary Proceeding was

---

[4] This would not include any funds obtained from Juno prior to our retention.

delayed for over two and one-half years due to Judge Blackshear's stay of discovery. See id.[5]

Further delay occurred when, despite the lack of discovery, the Committee sought to approve a settlement with Juno under Federal Rule of Bankruptcy Procedure 9019 (the "Initial Settlement"). See id. at 1416. After that purported settlement was approved over the Debtors' objections, the Debtors successfully appealed the approval to the United States Court of Appeals for the Second Circuit, which reversed and remanded the matter to Bankruptcy Court. In re Smart World Techs., LLC, 423 F.3d 166 (2d Cir. 2005); see J.A. No. 31.

### H.    The Proceedings Following Remand.

Consistent with the decision of the Second Circuit, on November 21, 2005, the Bankruptcy Court entered an order establishing a discovery deadline (the "Discovery Order") requiring the parties to, inter alia, do the following:

- a.    Exchange document requests on or before November 23, 2005;
- b.    Serve responses and objections to the initial document requests on or before December 23, 2005;
- c.    Conduct document production and inspection on a rolling basis on or before February 15, 2006;
- d.    Serve contention interrogatories on or after June 1, 2006;
- e.    Serve answers to interrogatories pursuant to Fed. R. Civ. P. 33, i.e., 30 days after the service of the interrogatories; and
- f.    End fact discovery by August 1, 2006.

See J.A. A-1705.

The Discovery Order permitted the parties to amend the schedule by consent. See id. at A-1706. Because, by late July 2006, it had become clear that the

---

[5] While the stay was in effect, Riker Danzig engaged in substantial activities including exploring settlement, seeking relief from the stay, mediating the matter and researching and investigating the matter, but was unable to fully and adequately investigate the Debtors' claims against Juno. See id. A-1415 to A-1416.

parties would not complete fact discovery within the time prescribed in the Discovery Order, the parties agreed to extend fact discovery by consent until September 15, 2006. See id. at A-1774.

Thereafter, the parties were not able to consensually resolve all outstanding discovery issues. Nor could they agree to further extend discovery. As a result, by motion filed September 15, 2006, the Debtors sought to extend the discovery deadline by sixty days. See J.A. No. 31. By Order dated October 6, 2006, Judge Peck granted this request. See id. at No. 33. Thereafter, the parties were able to complete the open discovery.[6]

### I.     The Plan and Confirmation Process.

On August 4, 2006, while the fact discovery process was still ongoing, the Committee filed its initial draft Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code for the Substantively Consolidated Debtors Smartworld [sic] Technologies, LLC, Freewwweb, LLC and Smartworld [sic] Communications Inc., Dated as of August 4, 2006 (the "Proposed Plan"). See id. at No. 11. Along with the Proposed Plan, the Committee filed its initial draft Disclosure Statement for Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code (the "Initial Disclosure Statement"). See id. at No. 10. The Debtors, various creditors and the U.S. Trustee each filed objections to the Initial Disclosure Statement. See id. at No. 12.

---

[6] After the Bankruptcy Court granted the extension, the parties completed the depositions of two Juno witnesses (Anthony Paterno and Wendy Rosenberg) and one former employee of the Debtors (Arthur "Jack" Brown) and exchanged certain documents.

Following several hearings and the Bankruptcy Court's directives on certain of the objections, the Committee filed an Amended Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors under Chapter 11 of the Bankruptcy Code for the Substantively Consolidated Debtors Smartworld [sic] Technologies, LLC, Freewwweb, LLC and Smartworld [sic] Communications, Inc. Dated as of October 16, 2006 (the "Committee Plan") and an Amended Disclosure Statement or Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors Under Chapter 11 of the Bankruptcy Code (the "Amended Disclosure Statement"). See id. at Nos. 14 & 15.

By Order dated October 23, 2006, the Bankruptcy Court approved the Amended Disclosure Statement, set a deadline for voting on the Committee Plan, set a deadline for objecting to the Committee Plan and scheduled a hearing to consider confirmation of the Committee Plan (the "Disclosure Approval Order"). See id. at No. 16. The Committee Plan was confirmed by the Bankruptcy Court at a hearing held on December 21, 2006. See Confirmation Hrg. Tr. at 206-19; J.A. A-1334 to A-1347. On December 27, 2006, the Bankruptcy Court entered the Confirmation Order memorializing its approval of the Plan. See J.A. No. 21.

**J.     The Fee Application, Objections and Hearings.**

Following entry of the Confirmation Order, on January 18, 2007, Riker Danzig, submitted its First and Final Application as Special Litigation Counsel to the Debtors and Debtors-in-Possession, Seeking Final Allowance and Payment of Compensation for Professional Services Pursuant to 11 U.S.C. § 328(a) (the "Fee Application"). See id. at No. 22. Through the Fee Application, Riker Danzig sought payment for $2,320,959.02 in fees and $78,489.13 in expenses. See J.A. A-1404 to A-

15

1405.[7]  In response to the Fee Application, objections were filed by (i) the Official Committee of Unsecured Creditors of the Debtors (the "Committee's Objection"), (ii) the Debtors' principals, Steven and Paula Daum, (the "Daums' Objection") and (iii) the U.S. Trustee (the "UST's Objection").  See J.A. Nos. 23 to 25.

A hearing on the Fee Application was held on February 21, 2007 (the "Fee Application Hearing"), during which the Bankruptcy Court reserved ruling on the Fee Application for thirty days until March 22, 2007.  See Fee Application Hrg. Tr. at 37:7 – 39:20; J.A. A-1662 to A-1664.  On March 22, 2007, the Bankruptcy Court rendered its decision as to the Fee Application (the "Fee Ruling"), and awarded Riker Danzig $1,207,816.00 in fees and $73,981.18 in expenses.  See Fee Ruling Tr. at 15:19 – 16:3; J.A. A-1692 to A-1693.[8]

### K. The Bankruptcy Court's Rationale for Varying from the Contingency Fee Proposal Approved by Judge Blackshear.

Judge Peck altered Riker Danzig's contingency fee arrangement citing the appropriate standard (Fee Ruling Tr. at 12:2-15; J.A. A-1689), but relying on the following grounds which, as detailed below (see Point II infra, pp. 23-32), failed to satisfy that standard:

---

[7] Based on the Revised Contingency Proposal incorporated into the Retention Order, and since the litigation continued for more than a year triggering the thirty-seven percent (37%) contingency fee, Riker Danzig calculated its contingency fee as follows:

| | |
|---|---|
| EXPENSES INCURRED | $    78,489.13 |
| BASE RECOVERY | $  500,000.00 |
| (1/3 of first $1.5 million over expenses) | |
| SLIDING SCALE RECOVERY | $1,820,959.02 |
| (37% of settlement above | |
| expenses and first $1.5 million) | |
| TOTAL | $2,399,448.15 |

See J.A. A-1427.

[8] This included a voluntary reduction of Riker Danzig's expenses from $78,489.13 to $73,981.18, which Riker Danzig does not seek to revisit in its appeal.

[T]he contingency fee arrangement in this case was improvident, because at the time Judge Blackshear entered the retention order it <u>could not have been anticipated</u> by him, or frankly by anyone else, that certain developments would occur.   These include:   <u>One</u>, <u>the divergent positions regarding litigation and settlement strategy</u> that developed between the Debtor and the Committee <u>and the resulting extreme antagonism, animosity and demonstrable lack of cooperation</u> that existed among interested parties in the bankruptcy case.

<u>Two</u>, the fact <u>that Riker Danzig</u> as special litigation counsel for the Debtor <u>took instructions directly from the [Daums]</u> who seemed to be [motivated] principally by their desire to benefit equity rather than the Creditors to whom the Debtors owed a fiduciary duty.

<u>Three</u>, <u>the unusually prolonged procedure[al] path of this litigation</u> caused in substantial part by the actions of Riker Danzig at the direction of the [Daums].

And <u>four</u>, the fact <u>that Riker Danzig</u>, again <u>acting at its client's direction</u>, was an obstacle, not an asset, when it came to approval of the settlement, which settlement was ultimately approved by this Court as part of the confirmed plan of reorganization, and Riker Danzig <u>worked</u> aggressively, albeit unsuccessfully, <u>to block the efforts of the committee to settle that litigation</u>.   These efforts substantially increased the administrative expenses in this bankruptcy case.

Fee Ruling Tr. at 14:18-15:18; J.A. A-1691 to A-1692 (emphasis added).

## LEGAL ARGUMENT

I.    **THE BANKRUPTCY COURT ONLY COULD ALTER RIKER DANZIG'S PRE-APPROVED CONTINGENCY FEE ARRANGEMENT IF IT WAS "IMPROVIDENT" BASED ON "DEVELOPMENTS NOT CAPABLE OF BEING ANTICIPATED."**

Because Judge Blackshear authorized the Debtors to employ Riker Danzig on a contingency fee basis,[9] Judge Peck could only modify Riker Danzig's fees "if such terms and conditions prove[d] to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).   This is a high standard since it requires both <u>unforeseeable</u> developments and <u>improvidence</u>.

A.    **Bankruptcy Code § 328(a) Requires Both "Improvidence" and Unforeseeable Events.**

Case law recognizes that, before a court can alter a fee arrangement pre-approved under Bankruptcy Code § 328(a), it must find developments that both (i) are incapable of anticipation and (ii) undermine the terms of the initial retention. <u>Unsecured Creditors Comm. v. Webb & Daniel</u>, 204 B.R. 830, 834 (Bankr. M.D. Ga. 1997) ("Where the bankruptcy court previously approved compensation terms, it cannot subsequently alter those terms unless the original terms were improvident in light of unanticipated developments."); <u>Nischwitz v. Miskovic (In re Airspect Air, Inc.)</u>, 288 B.R. 464, 471 (B.A.P. 6th Cir. 2003) ("[A]n intervening circumstance, in order to render improvident a court's decision to grant a fee application, must be one that would

---

[9] The Committee's meritless appeal of Judge Peck's ruling on this point is addressed in detail in Point IV below, <u>see</u> <i>infra</i> at pp. 36-40.

have affected the court's decision in the first place. It must have been relevant to that decision in some way, rendering it untenable or unwise in hindsight.").

**B.    "Improvident" is a Heightened Determination Which Rarely is Met.**

By using the term "improvident," Bankruptcy Code § 328(a) imposes a significant burden on a court modifying a pre-approved fee arrangement.

"Improvident" means "[l]acking foresight and care in the management of property[,]" or "[o]f or relating to a judgment arrived at by using misleading information or a mistaken assumption." Black's Law Dictionary 773 (8th ed. 1999). As a result, "improvident" is a standard that can rarely be met:

> [a] finding of improvidence pursuant to section 328 is a difficult determination to make[, and] . . . courts rarely disturb the original terms and conditions of a professional's employment.

In re XO Commc'ns, Inc., 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005) (emphasis added).

**C.    "Not Capable of Being Anticipated" Adds Another High Hurdle Which Goes Beyond Merely "Unanticipated" or "Unforeseen."**

It is not enough for a court to cite unanticipated or unforeseen developments to modify a professional's pre-approved contingency fee. It must identify developments so extraordinary that they were "not [even] capable of being anticipated." 11 U.S.C. § 328(a). One commentator explained this requirement as follows:

> It is important to note that simply "unanticipated" developments or circumstances do not warrant a finding of improvidence. Section 328 "allows revision of a fee agreement only if a development was not capable of being anticipated at the time of the fixing of such terms and conditions." Whether the event was actually anticipated is immaterial. The relevant inquiry is whether the event was capable of anticipation. Therefore, a simple finding that the professional seeking compensation did not anticipate a change in circumstances does not satisfy section 328(a). To

> alter a fee agreement under section 328, the bankruptcy
> court must find that it was not possible for the professional
> seeking compensation to anticipate the change in
> circumstances.

Robert J. Landry, III & James R. Higdon, A Primer on 11 U.S.C. 328(a) and its Use in Alternative Methods in Bankruptcy, 50 Mercer L. Rev. 537, 554 (1999) (internal citations and quotations omitted) (emphasis added).[10] Accord Webb & Daniel, 204 B.R. at 834 ("improvidence" necessitates proof that it was impossible to have anticipated the intervening circumstances that have rendered the retention order's terms unwise).

Most of the decisions addressing the "not capable of being anticipated" factor establish only what behavior does not meet the criteria. See Daniels v. Barron (In re Barron), 325 F.3d 690, 694 (5th Cir. 2003) (unanticipatable must be more than not anticipating (a) the substantial amount of the recovery contingency counsel was retained to pursue, (b) the adversary proceeding would become a "slam dunk" for special counsel to litigate or (c) the judgment was collected with "relative ease"); Seiler v. First Nat'l Bank (In re Benassi), 72 B.R. 44, 49 (D. Minn. 1987) (stating that twenty-twenty vision at the end of a case will not permit a bankruptcy court to modify a pre-approved § 328(a) fee); cf. In re Confections by Sandra, Inc., 83 B.R. 729, 733 (B.A.P. 9th Cir. 1987) (improvidence cannot be the reduction of a contingency fee on the basis

---

[10] This distinction is apparently lost on all of those who objected to the Fee Application. The objectors all argued at the Fee Application Hearing that the Court should find improvidence as a result of unanticipated circumstances at the time the Retention Order was entered, rather than arguing for improvidence based on circumstances not capable of being anticipated at the time the Retention Order was entered. See, e.g., Fee Application Hrg. Tr. at 26:1-3; J.A. A-1651 (Committee counsel arguing for improvidence because "that's basically what the parties were anticipating when they entered into this agreement."); see id. at 33:18-19; J.A. A-1658 (U.S. Trustee contending that this Court should find the Retention Order was improvidently entered because "I believe that that is a circumstance that was not really contemplated.").

of conservation of the estate, particularly where the underlying litigation for which special counsel was retained was hard fought and featured several appeals).

> **D.    It is Inappropriate to Employ a Retrospective Reasonableness Analysis Absent a Finding of "Improvidence" and "Unforseeability."**

When counsel has been pre-approved under a special arrangement pursuant to Bankruptcy Code § 328, the "reasonableness" provisions of Bankruptcy Code § 330 do not apply to the allowance of counsel's fees:

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103 . . . reasonable compensation [and] reimbursement for actual, necessary assessments . . . .

11 U.S.C. § 330(a)(1) (emphasis added).  Accord Nischwitz v. Miskovic (In re Airspect Air, Inc.), 385 F.3d 915, 921 (6th Cir. 2004) ("Once the bankruptcy court has approved a rate or means of payment, such as a contingent fee, the court cannot on the submission of the final fee application instead approve a reasonable fee under § 330(a), unless the bankruptcy court finds that the original arrangement was improvident due to unanticipated circumstances as required by § 328(a)."); In re High Voltage Eng'g Corp., 311 B.R. 320, 332-33 (Bankr. D. Mass. 2004) (noting that "once a fee arrangement is approved under § 328, the ability of the bankruptcy court, as well as creditors and parties in interest, to review the amount of compensation payable to the professional is circumscribed [and] . . . cannot be modified without a finding [that its terms] were improvident"); In re Olympic Marine Servs., Inc., 186 B.R. 651, 654 (Bankr. E.D. Va. 1995) (under § 328(a), bankruptcy courts may not "later reduce previously approved contingency fees based upon the usual tests for reasonable compensation").  Therefore,

Judge Peck was not permitted to review Riker Danzig's fees retrospectively under the § 330 reasonableness standard.

As detailed in Point II, *infra* at pp. 23-32, Judge Peck's rulings in abandoning Riker Danzig's contingency fee arrangement here fall far short of establishing "unforeseability" or "improvidence" and, thus, his reduction of Riker Danzig's pre-approved fee arrangement was improper.

II.    **ALL OF THE FACTORS CITED BY THE BANKRUPTCY COURT COULD HAVE BEEN ANTICIPATED WHEN RIKER DANZIG'S CONTINGENCY FEE RETENTION WAS APPROVED.**

Judge Peck modified Riker Danzig's compensation based on several factors. However, none of the factors he cited were "not capable of being anticipated" or would have impacted Judge Blackshear's approval of the terms of Riker Danzig's compensation in the first instance. As a result, this Court must reverse the Final Fee Order to the extent it allowed Riker Danzig less than the amounts due in accordance with the Retention Order and the Revised Contingency Proposal.

A.    **Riker Danzig Foreseeably and Properly Pursued the Appeal.**

One of the factors cited by Judge Peck was "the unusually prolonged procedural path of this litigation. . . ." Fee Ruling Tr. at 15:7-8; J.A. A-1692. To the extent Judge Peck is referring to Riker Danzig's appeal of the Initial Settlement, this cannot meet the legal standard for modifying Riker Danzig's compensation.

Appeals are not unforeseeable. To the contrary, obviously they are reasonably expected. Courts regularly observe that appeals are both likely and foreseeable developments in all aspects of litigation. See Willemijn Houdstermaatschaapij BV v. Apollo Computer, 707 F. Supp. 1429, 1435 (D. Del. 1989) (opining that an appeal is foreseeable where the parties are contentious and the issues are hotly contested). See also, e.g., Falke, Inc. v. Cafritz Co. (In re Falke, Inc.), Adv. Pro. No. 05-1488, 2006 Bankr. LEXIS 2814, at *12 (Bankr. E.D. Va. June 14, 2006) (stressing the need for a resolution of issues while noting the reality that "appeals are likely in any event"); Wisecarver v. Moore, No. 1:05-CV-194-R, 2006 U.S. Dist. LEXIS 49664, at *4 (W.D. Ky. July 19, 2006) (acknowledging that a decision by the

district court on a specific issue "would likely also be appealed in any event"); <u>Ams. United for Separation of Church & State v. Prison Fellowship Ministries</u>, 432 F. Supp. 2d 862, 941 (S.D. Iowa 2006) (noting as likely that a party will appeal the district court decision); <u>Nelson v. Ipalco Enters., Inc.</u>, No. IP02-0477-C-H/K, 2005 U.S. Dist. LEXIS 16909, at *11 (S.D. Ind. Aug. 11, 2005) (observing that a grant of summary judgment to either party would likely result in an appeal); <u>Cox v. Via</u>, No. 95-3160, 1995 U.S. Dist. LEXIS 14914, at *8 n.2 (E.D. Pa. Oct. 13, 1995) (recognizing that there is a "likely event that the instant order is appealed"); <u>Sampson v. Sampson</u>, 142 B.R. 957, 958 (D. Colo. 1992) (noting that there is a "likely event that this decision may be appealed").

Significantly, the Debtors were <u>fully vindicated</u> in the appeal by the Second Circuit.  The Second Circuit concluded that the Initial Settlement was improper for two principal reasons.  First, it recognized that the Debtors (as opposed to the Committee or any of the other creditors) were the only party with authority to settle the claims against Juno under Bankruptcy Rule 9019.  <u>Smart World Techs.</u>, 423 F.3d at 177-80.  Moreover, it recognized that any settlement was undermined by the lack of an adequate investigation of the facts related to those claims.  <u>Id.</u> at 179.[11]

---

[11] In this way, if any party was responsible for "unnecessarily prolonging" the litigation, it was the Committee, which pursued a premature and inappropriate procedural mechanism for resolving the Debtors' claims against Juno by joining with Juno and WorldCom to propose the Initial Settlement. Moreover, given that Riker Danzig was employed on a contingency fee basis, this process did not hurt the Debtors' bankruptcy estate, only Riker Danzig!

Accordingly, this Court cannot affirm Judge Peck's modification of Riker Danzig's compensation based on the appeal. It was not unforeseeable; nor was it improvident.[12]

**B.    Riker Danzig Foreseeably and Properly Conducted the Litigation After Completing the Appeal.**

Riker Danzig's actions after the appeal also were not unforeseeable or improvident. It substantially adhered to the discovery schedule established by the Bankruptcy Court. In objecting to the Proposed Plan and the Initial Disclosure Statement, the Debtors, through Riker Danzig as their counsel, sought to provide the Bankruptcy Court and its creditors with full information regarding the Debtors' claims in order to permit them to make an informed decision about the Plan and the settlement incorporated into the Plan.

**1.    The Debtors Complied With the Discovery Schedule.**

Following the appeal, the Bankruptcy Court, mindful of the Second Circuit's determination that the Debtors had not been afforded an adequate opportunity to investigate their claims against Juno, Smart World Techs., 423 F.3d at 179, adopted a discovery schedule. See J.A. No. 29. That schedule provided for initial disclosures and document exchanges over approximately three to four months, followed by depositions and interrogatories over another four to six months, followed by expert reports and depositions. See id.

The parties substantially adhered to that schedule. While there were some discovery disputes, most were resolved consensually. The Bankruptcy Court granted

---

[12] Importantly, after the appeal, and due to Riker Danzig's continued investigation of the Debtors' claims and willingness to pursue those claims through trial, Juno's proposed settlement increased by $1,000,000 from $5,500,000 to $6,500,000.

only one sixty-day extension of the original discovery schedule.  <u>See</u> J.A. No. 33.

Thus, the discovery conducted was not unforeseeable or unnecessarily long.

2.    **The Debtors' Participation in the Confirmation Process was Appropriate.**

Nor were the Debtors' objections to the Initial Disclosure Statement or to

the Proposed Plan unforeseeable or unnecessary.  To the contrary, in objecting to the

Initial Disclosure Statement, the Debtors were seeking to provide creditors with full and

adequate information about the claims to be settled in the Plan.  <u>See</u> J.A. No. 12.

Likewise, in objecting to the Proposed Plan, the Debtors were presenting the legal and

factual arguments affecting the value of the Juno claims which the Bankruptcy Court

had to consider in determining whether the settlement met the applicable legal standard.

<u>See</u> J.A. No. 17.

Significantly, in confirming the Committee Plan, Judge Peck recognized

how close the settlement was to the lowest applicable legal standard.  <u>See</u> J.A. A-

1345.[13]   Judge Peck recognized both at the Confirmation Hearing and at the Fee

Application Hearing that Riker Danzig's legal theories and arguments were foreseeable,

creative lawyering.  <u>See</u> J.A. A-1344, A-1651 to A-1652.[14]

---

[13] Judge Peck damned the settlement with faint praise:

the [settlement] does not fall below the lowest point in the range of reasonableness.  <u>It may be right at that level</u>, but it is not below it.

Confirmation Hrg. Tr. at 217:23-25, J.A. A-1345 (emphasis added).

[14] At the Confirmation Hearing, Judge Peck praised the creativity of Riker Danzig's argument:

the supplemental damage claims are, in my judgment, creative arguments.

Confirmation Hrg. Tr. at 216:2-3, J.A. A-1344.

At the Fee Application Hearing, in response to the Committee's contention that Riker Danzig's theories of recovery were an unforeseeable event, Judge Peck reiterated that such creativity is to be expected from skilled counsel, particularly contingency fee counsel:

THE COURT:   That to me does not seem to be an unanticipated event.  That seems to me to be creative lawyering.

(footnote continued...)

26

**C.    Any Antagonism Did Not Involve Counsel and was Foreseeable in Any Case.**

Judge Peck also noted the "extreme antagonism, animosity and demonstrable lack of cooperation" which developed in the Debtors' bankruptcy case as a factor rendering Riker Danzig's pre-approved fee arrangement "improvident." Fee Ruling Tr. at 14:24-25; J.A. A-1691.    However, the Committee's own counsel contradicted Judge Peck's view.  In any case, such disagreements over the value of a debtor's assets and positions in a bankruptcy case are not unforeseeable.

In response to Judge Peck's questioning at the Fee Application Hearing, counsel to the Committee conceded that all counsel had proceeded in a cooperative and professional manner in administering the Debtors' bankruptcy cases:

> I don't think in the three years that I was involved in this case that there was one rancorous conversation that I had with any counsel for anyone on the debtor's side.
>
> *   *   *
>
> I just don't believe there was any overt hostility, certainly among the professionals, and I don't believe that there was any unnecessary amount of rancorous litigation between us that caused the fees and the expenses in this case to be higher than they would have been.

Fee Application Hrg. Tr. at 10:16-19; 11:2-6; J.A. A-1635 to A-1636 (emphasis added).

More importantly, it was not unforeseeable at the time Riker Danzig was retained that the Debtors and other constituencies might disagree over the value of the Debtors' claims against Juno.  Disagreements over the value of a debtor's assets are

_____

> *   *   *
>
> THE COURT:  I think that it's foreseeable that contingent fee counsel will do everything that it can reasonably do consistent with the canons of ethics to maximize the recovery for the estate.

Fee Application Hrg. Tr. at 26:25-27:2; 27:4-7; J.A. A-1651 to A-1652.

unquestionably foreseeable in a bankruptcy case.  See, e.g., Travellers Int'l, AG v. TWA (In re TWA), 134 F.3d 188, 192 (3d Cir. 1998) (discussing the disagreement surrounding the fair valuation of the debtor's assets); In re Frank Fehr Brewing Co., 268 F.2d 170, 177 (6th Cir. 1959) ("There is considerable disagreement about the value of [the debtors'] 'current assets' in the event of liquidation."); Official Comm. of Unsecured Creditors of Qualitech Steel Corp. v. Bank Group (In re Qualitech Steel Corp.), No. IP 00-496-C H/G, 2001 U.S. Dist. LEXIS 11768, at *17-18 (S.D. Ind. Jul. 5, 2001) (discussing the controversy surrounding the true value of the debtor's assets), aff'd, In re Qualitech Steel Corp., 276 F.3d 245 (7th Cir. 2001); Estate of Messina v. Berney (In re Messina), No. 99 B 29371, 2003 Bankr. LEXIS 1245, at *41 (Bankr. N.D. Ill. Sept. 29, 2003) ("The Debtor further avers that he and the Trustee disagree over the liquidation value of the Debtor's non-cash assets . . . .").

Animosity and rancor between debtors and creditors also is common in many bankruptcies.  See, e.g., In re Marvel Entm't Group, 140 F.3d 463, 474 (3d Cir. 1998) (acknowledging that "antagonism and animosity between a debtor and creditor can be expected in any bankruptcy proceeding"); In re Marsico, No. 01-12120-JMD, 2004 Bankr. LEXIS 43, at *18 (Bankr. D.N.H. Jan. 5, 2004) ("It is unmistakable that there are [] animosities between the Debtor and both of the Creditors."); Refrigerant Reclamation Corp. of Am. v. Todack (In re Refrigerant Reclamation Corp. of Am.), 186 B.R. 78, 84 (Bankr. M.D. Tenn. 1995) (discussing "the rancorous relationship between the reorganized debtor and [a] creditor").

In any case, to the extent the divergence in positions between the Debtors and the Committee might not have been foreseen at the time of Riker Danzig's retention, it certainly was foreseeable.  Given that modification of Riker Danzig's fee

arrangement required "developments <u>not capable</u> of being anticipated," 11 U.S.C. § 328(a) (emphasis added), the divergence in the position of the Debtors and the other parties cannot be a basis for modifying Riker Danzig's pre-approved terms of retention.

**D.    Riker Danzig Foreseeably and Properly Followed the Direction of the Debtors' Principal Officers.**

Judge Peck also cited "the fact that Riker Danzig . . . took instructions directly from the [Daums]" as an unforeseeable development rendering its compensation improvident.  Fee Ruling Tr. at 15:3-4; J.A. A-1692.  Not only was it foreseeable that Riker Danzig would follow the directives of the Debtors' principal officers and majority owners, it was legally and ethically required that it do so.  Thus, this cannot render Riker Danzig's fee agreement "improvident."

It would have been completely inappropriate for Riker Danzig to reveal to the Bankruptcy Court or the creditors its advice to the Debtors.  Therefore, the Bankruptcy Court had no way of knowing what "instructions" the Debtors' principals gave to Riker Danzig, or what Riker Danzig's advice to the Debtors may have been. Nor was it appropriate for Riker Danzig to seek to remove the Daums from the Debtors' management.  Since no other party ever sought to remove the Daums, it was not only foreseeable, but wholly appropriate, even legally and ethically required, for Riker Danzig to follow the Debtors' direction in prosecuting the claims against Juno.[15]

---

[15] It is indisputable that an attorney must follow the direction of its client.  <u>See</u> <u>Marro v. Adamski & Conti</u>, No. 97 C 8805, 1998 U.S. Dist. LEXIS 15731, at *4 (N.D. Ill. Sept. 25, 1998) ("An attorney is obligated to follow the instructions of his client."); <u>Hansen, Jones & Leta, P.C. v. Segal</u>, 220 B.R. 434, 466 (D. Utah 1998) (citing <u>In re Spanjer Bros., Inc.</u>, 191 B.R. 738, 751 (Bankr. N.D. Ill. 1996)) ("'[A]n attorney is obliged to follow the directions of his client.'"); <u>United States v. Monnat</u>, 853 F. Supp. 1304, 1307 (D. Kan. 1994) (indicating that a lawyer must follow the lawful instructions of its client). The only possible exception being when the client is engaged in fraud or criminality, <u>see</u> N.Y. Code of Prof'l Responsibility DR 7-102(A)(7) (2007), neither of which is even suggested by the facts here.

The Daums were the Debtors' principal officers.  In fact, for much of the time Riker Danzig was pursuing the Debtors' claims against Juno, the Daums were the Debtors' only employees and officers.

As debtors-in-possession, the Debtors and the Daums retained the ability to control the Debtors' business and assets.  See United States v. Levy, 992 F.2d 1081, 1082 (10th Cir. 1993) (recognizing that the director controlled the assets of the debtor-in-possession bankruptcy estate); Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't Group), 209 B.R. 832, 838 (D. Del. 1997) (observing that directors of a debtor-in-possession control and manage the debtor's operations and therefore exercise control over the estate's assets); Robson, Miller & Oseserman v. D.H. Overmyer Telecasting Co. (In re D.H. Overmyer Telecasting Co.), 77 B.R. 128, 147 (Bankr. N.D. Ohio 1987) (noting that the director of the debtor-in-possession controlled the debtor's assets).

This left Riker Danzig subject to the Daums' and the Debtors' directives with respect to the litigation.  As the Second Circuit recognized, the Daums, for the Debtors, were obligated to pursue the Juno litigation to maximize the recovery by all interested parties, meaning creditors as well as equity.  Smart World Techs., 423 F.3d at 177.[16]

---

[16] Consistent with the Second Circuit's principle, throughout the proceedings on the Initial Settlement, as well as in the proceedings leading to confirmation of the plan, the Debtors and Riker Danzig repeatedly sought to maximize the recovery by the Debtors' bankruptcy estates.  At the 9019 Hearing Riker Danzig summarized the Debtors' position as follows:

> Given all the factors and the status of the litigation and the impediments to proceeding with litigation, we believe there's a reasonable prospect of the Debtors recovering substantially more than the amount on the table and that the offer being placed on the table is outside the realm of reasonableness.

Initial Settlement Hrg. Tr. at 28.17-24.  They reiteriated this position at the Confirmation Hearing:
(footnote continued…)

It is uncontroverted that corporations can act <u>only</u> through their officers and employees.  <u>See</u> <u>United States v. Wallach</u>, 935 F.2d 445, 462 (2d Cir. 1991) ("[A] corporation can only act through its agents -- officers and directors."); <u>In re Parmalat Sec. Litig.</u>, 04 MD 1653 (LAK), 2007 U.S. Dist. LEXIS 20785, at *32 (S.D.N.Y. Mar. 23, 2007) (recognizing that a corporation can only function through its employees and agents); <u>Goldfine v. Sichenzia</u>, 118 F. Supp. 2d 392, 403 (S.D.N.Y. 2000) ("corporations can act only through their individual officers, directors or agents").

Accordingly, Riker Danzig's adherence to the directions of the Debtors' officers cannot be an unforeseeable development which would render Riker Danzig's pre-approved, contingency fee arrangement "improvident."   To the extent the Bankruptcy Court was imputing the Daums' motivation and actions to Riker Danzig, it committed reversible legal error.

Because none of the factors cited by Judge Peck as "developments not capable of being anticipated" were, in fact, unforeseeable and, moreover, because none of these factors would have affected Judge Blackshear's decision to retain Riker Danzig on the terms he approved, this Court must, as a matter of law, reverse the Final Fee Order to the extent it reduced Riker Danzig's compensation from the amount due under

---

The Debtor believes that the claims are worth substantially more, and the Debtor objects to even the baseline settlement of $6.5 million because we believe, as our proofs will show, Your Honor, that that is the bare minimum that the Debtor could recover at the end of the day after trial.

Confirmation Hrg. Tr. at 46:19-24; J.A. A-1174.  The Bankruptcy Court also recognized the possibility of a greater recovery at the Confirmation Hearing:

The pressure of trial might lead to an enhanced settlement offer.  That is certainly a possibility.

Confirmation Hrg. Tr. at 212:-20-21; J.A. A-1340.

its contingency fee arrangement and order that Riker Danzig be compensated in accordance with the Revised Contingency Proposal.

### III. IN REDUCING RIKER DANZIG'S FEE, THE BANKRUPTCY COURT NOT ONLY IGNORED BANKRUPTCY CODE § 328(a), BUT CONGRESS' INTENT AND SOUND BANKRUPTCY POLICY.

#### A. Modifying Riker Danzig's Fee Arrangement is Contrary to Congress' Intent.

Several decisions have noted that through the 1978 enactment of Bankruptcy Code § 328(a), Congress sought to expand pre-Code notions of frugality and economy of the estate which previously had governed fee awards in bankruptcy cases. See Benassi, 72 B.R. at 47 (observing that courts are "no longer bound by pre-Code notions of frugality and economy in fixing fees"); In re Warrior Drilling & Eng'g Co., 9 B.R. 841, 850 (Bankr. N.D. Ala. 1981) ("Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.") (citing legislative history); cf. In re Hunt's Health Care, Inc., 161 B.R. 971, 975 n.1 (Bankr. N.D. Ind. 1993) (intimating that if courts heighten the uncertainty of a bankruptcy professional's fees it will cause estates to be served by less able bankruptcy specialists and creditors to be forced to tolerate the costs of inefficient management).

"Congress understood that unless business lawyers were awarded rates in reorganization cases that they are paid for professional services in nonbankruptcy cases, there would be insufficient economic incentive to practice in the bankruptcy courts." In re Atlas Automation, Inc., 27 B.R. 820, 822 (Bankr. E.D. Mich. 1983). In fact, Congress explicitly noted the importance of ensuring that fees in bankruptcy cases were consistent with those in other comparable practice areas:

> . . . . bankruptcy legal services are entitled to command the same competency of counsel as other cases. In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated

> for performing comparable services other than in a case
> under title 11.

124 Cong. Rec. H 11, 091-2 (Sept. 28, 1978); S 17, 408 (Oct. 6, 1978).[17]

In enacting this new fee regime, Congress stressed abandoning pre-Code notions of frugality and economy of the estate continued so that bankruptcy professionals' fees were sufficient to draw quality practitioners:

> Bankruptcy specialists, however, if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.
>
> Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service.

H.R. Rep. No. 95-989, 95th Cong., 2d Sess. at 330 (1978), as reprinted in U.S.C.C.A.N. 5787, 6286.  See Atlas Automation, 27 B.R. at 822 ("The justification from turning away [for] the frugal standards of compensation applied in cases under the Bankruptcy Act of 1898, as amended, was to improve the quality of practice in the bankruptcy courts.").

Here, the Bankruptcy Court's reduction of Riker Danzig's fees and expenses undermines the legislative intent underlying Bankruptcy Code § 328.  Like most contingency fee arrangements, Riker Danzig's role as special litigation counsel involved a high risk and high reward assignment.  See Retention Hrg. Tr. 27:12-16, J.A.

---

[17] In this case, Riker Danzig's arrangement was consistent with Second Circuit case law addressing the reasonableness of contingency fee agreements.  See, e.g., In re Labelon Corp., No. 02-22582, 2006 Bankr. LEXIS 649, at *14 (Bankr. W.D.N.Y. Mar. 24, 2006) (opining that a 30% contingent fee in a bankruptcy case is "reasonable"); In re Cosmopolitan Shipping Co., No. 77 Civ. 1425, 1978 U.S. Dist. LEXIS 7019, at *4 (S.D.N.Y. Dec. 26, 1978) (noting that 33% is generally accepted as a reasonable contingency fee arrangement).

A-0068 (recognizing that Riker Danzig, as contingency fee counsel, took on the risk of not being paid if the Debtors did not realize success in the Juno litigation). In reducing Riker Danzig's fees, the Bankruptcy Court forced its own notions of reasonableness into the narrow § 328 exception. The Bankruptcy Court should not be permitted to usurp congressional intent and substitute its own notion of fairness, especially since Bankruptcy Code § 328 explicitly proscribes that level of flexibility and discretion. This is just the kind of hindsight analysis Bankruptcy Code § 328(a) was designed to avoid.

**B.      Modifying Riker Danzig's Fee Arrangement Has Negative Policy Implications.**

Not only did the Bankruptcy Court's approach violate congressional intent, it establishes a disincentive to future contingency fee arrangements. The purpose of permitting contingency fees in Bankruptcy Code § 328(a) is to move away from hindsight evaluations of fee applications. No professional would agree to a contingency arrangement with such a "heads I win, tails you lose" component.

Here, the Bankruptcy Court did little more than decide that Riker Danzig was receiving too much. In doing so, it not only failed to apply the applicable standard of Bankruptcy Code § 328(a), it also rode roughshod over Congress' intent as expressed in that section and provided a disincentive to future counsel considering contingency arrangements. As a result, this Court must reverse the Final Fee Order and allow Riker Danzig's fee in the full amount required by the Retention Order and the Revised Contingency Proposal.

## IV.    ALTHOUGH IT ERRED IN MODIFYING RIKER DANZIG'S FEE AWARD, THE BANKRUPTCY COURT CORRECTLY HELD THAT RIKER DANZIG'S CONTINGENCY FEE ARRANGEMENT WAS PRE-APPROVED UNDER BANKRUPTCY CODE § 328(a).

Contrary to the contentions of the Committee's cross-appeal, Riker Danzig undoubtedly was retained as a pre-approved contingency fee counsel pursuant to Bankruptcy Code § 328(a).  The Retention Application specifically referenced both Bankruptcy Code § 328(a) and a contingency fee arrangement.  See J.A. A-1411.  The Retention Order specifically approved the contingency fee arrangement embodied in the Revised Contingency Proposal.  See J.A. No. 8.  The proceedings on the Retention Application are fully consistent with this conclusion.

### A.    Bankruptcy Courts Can Retain Counsel on Special Terms.

While bankruptcy courts generally permit debtors to retain counsel on a "fee for services" basis, 11 U.S.C. § 327,[18] subjecting them to a retrospective review of their fees for "reasonableness," 11 U.S.C. § 330,[19] the Bankruptcy Code permits

---

[18] Bankruptcy Code § 327 generally governs the ability of a trustee (and, pursuant to Bankruptcy Code § 1107, a debtor-in-possession) to retain counsel:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

[19] Bankruptcy Code § 330 provides the standard for approval of counsel's fees unless an alternative arrangement is approved by the bankruptcy court:

> (a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—
>
> > (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
> >
> > (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

alternative arrangements under Bankruptcy Code § 328. This section specifically authorizes a bankruptcy court to approve counsel on a contingency fee basis:

> (a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, <u>or on a contingent fee basis</u>.

11 U.S.C. § 328 (emphasis added).

### B.   Riker Danzig's Revised Contingency Proposal was Pre-Approved Pursuant to 11 U.S.C. § 328.

When the Debtors sought to retain Riker Danzig, they did so under Bankruptcy Code § 328 and specifically presented a contingency fee arrangement. The Revised Contingency Proposal provided that Riker Danzig "will handle disputes between the debtor and Juno . . . on a <u>contingent fee basis</u>." Revised Contingency Proposal at ¶ 1; <u>see</u> J.A. A-1443 (emphasis added).

The fee arrangement detailed within the Revised Contingency Proposal was for a contingency fee based on recoveries from Juno:

> Riker Danzig will take the case in consideration of the following payment terms: 1) Riker Danzig will be paid all expenses off of the top any recovery and, after payment of expenses, will receive 33-1/3% of the first $1,500,000 obtained from Juno[20]; 2) Riker Danzig's share of funds in excess of $1,500,000 but less than $8 Million will be (a) 0% if the litigation lasts less than 6 months, (b) 10% if the litigation lasts from 6 months to 9 months, (c) 20% if the litigation lasts between 9 months and 12 months, (d) 37% if the litigation lasts more than 12 months; and 3) Riker Danzig will receive 37% of all funds received in excess of $8 Million. Finally, Riker Danzig's fee for any monies received after 18 months shall be 33 1/3%.

---

[20] This would not include any funds obtained from Juno prior to our retention.

Revised Contingency Proposal at ¶ 1(footnote in original); <u>see</u> J.A. A-1443 to A-1444. This specific arrangement was described to Judge Blackshear at the Retention Hearing by WorldCom's counsel.  Retention Hrg. Tr. at 23:4-24:15; J.A. A-0064 to A-0065.[21]

All parties present at the Retention Hearing recognized that, under the terms of the Revised Contingency Proposal, Riker Danzig was proposing to be pre-approved under Bankruptcy Code § 328(a):

> MS. MAYERSON [counsel to WorldCom]:  Your Honor, just to clarify.  [Riker Danzig's] fee application will be consistent with the contingency fee agreement and lay out what the proceeds were, et cetera, as opposed to the typical fee application?

Retention Hrg. Tr. at 28:5-8; J.A. A-0069.[22]

Judge Blackshear accepted these terms and pre-approved them as reasonable:

> THE COURT:  The contingency fee basically addresses the reasonableness . . . .
>
> * * *
>
> If he's willing to take that chance, on success being paid and unsucccess not getting anything, that to me addresses the reasonableness of his fee. . .
>
> * * *
>
> THE COURT:  I'm not going to review the time records of the individual merely because of the fact that he agreed to a contingency fee.

Retention Hrg. Tr. at 26:8-9; 26:18-21; 27:6-8; J.A. A-0067 to A-0068.

---

[21] WorldCom's counsel's description is set forth at length on p. 10 *supra*.

[22] The Second Circuit also recognized Riker Danzig's contingency basis in a subsequent appeal.  <u>Smart World Techs.</u>, 423 F.3d at 180 ("Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award.").

In sum, Judge Blackshear was well aware of all the relevant factors in authorizing the Debtors to retain Riker Danzig. He did so knowing and understanding that he was pre-approving the contingency fee arrangement as reasonable and foreclosing a retrospective reasonableness analysis and he, as well as the Committee and the other creditors, all knew that Riker Danzig would be paid from any "recoveries from Juno" whether or not they resulted from a settlement brokered by the Committee or from a full and final litigation to judgment.

### C.    The Bankruptcy Court Correctly Determined That Riker Danzig was Pre-Approved Based on the Revised Contingency Fee Proposal.

With this abundant evidence that Riker Danzig was pre-approved as § 328(a) counsel, Judge Peck, too, concluded at the outset that Riker Danzig had been specifically approved as contingency fee counsel in accordance with the Revised Contingency Proposal:

> I am satisfied, based upon my review of the record and the multiple papers that have been filed both in support of your application and objecting to your application, that an order was entered by Judge Blackshear to retain your firm under Section 328 of the Bankruptcy Code.

Fee Application Hrg. Tr. at 13:11-15; J.A. A-1638; see also id. at 37:14-15; J.A. A-1662 ("I am satisfied that this is a 328 retention and I've said that already.").[23]

Judge Peck's belief that Riker Danzig was retained on a contingency fee basis did not waiver. In fact, he later confirmed this belief at the Fee Ruling Hearing:

> In this case, based upon the representations that took place during the argument on the Riker Danzig fee, I'm satisfied

---

[23] At the Fee Hearing, the U.S. Trustee's counsel also recognized that Riker Danzig had been retained on a pre-approved contingency fee basis: the retention did provide for a scheduled form of payment which is akin to a contingency fee arrangement. See Fee Application Hrg. Tr. at 32:2-4; J.A. A-1657.

> based upon what was said in open court and based upon my
> review of the record, that Riker Danzig in good faith
> undertook a contingency fee agreement and did so at the
> time with the support of all interested parties in the case.

Fee Ruling Tr. at 14:12-17; J.A. A-1691.

Based on the overwhelming evidence in the Revised Contingency Proposal, the Retention Hearing Transcript, the Fee Application Hearing Transcript and the Fee Ruling Transcript, the Debtors unequivocally retained Riker Danzig as special litigation counsel on a contingency fee basis.[24]  To assert that Riker Danzig was retained under an arrangement other than a contingency would contradict all evidence and would undermine the shared logic understood by all parties to this bankruptcy.

---

[24] This conclusion is buttressed by the inescapable fact that the Daums' Objection, authored by the Debtors' principals, the Daums, acknowledged that Riker Danzig was retained on a contingency fee basis.  See J.A. No. 23.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Riker Danzig respectfully requests that the Bankruptcy Court (a) reverse the Final Fee Order, (b) enter judgment allowing Riker Danzig its full contingency fee of $2,399,448.15, (c) remand for further proceedings in accordance with this determination and (d) grant Riker Danzig such other and further relief as the Court deems equitable and just.

> RIKER, DANZIG, SCHERER, HYLAND
> & PERRETTI LLP
> *Pro se*, for services rendered as Special Litigation Counsel to Debtors and Debtors-in-Possession, Smart World Technologies, LLC, Freewwweb, LLC and Smart World Communications, Inc.
>
>
> By:  /s/    Seth H. Lieberman
> Glenn D. Curving  (GC-3464)
> J. Alex Kress  (JK-7189)
> Seth H. Lieberman  (SL-4880)

Dated:  May 25, 2007