UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SMARTWORLD TECHNOLOGIES, LLC, et al.,<br><br>                    Debtors. | Bankr. Case Nos. 00-41645 through 00-41647(JMP) |
| RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP,<br><br>                    Appellant/Cross-Appellee,<br><br>                    v.<br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>                    Appellee/Cross-Appellant. | Case No.  07-CV-03603 |

**BRIEF OF APPELLEE/CROSS-APPELLANT OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SMARTWORLD TECHNOLOGIES, LLC ET AL.**

**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**
Counsel for Appellee/Cross-Appellant
Laurence May, Esq. (LM-9714)
Bonnie L. Pollack, Esq. (BP-3711)
900 Third Avenue
New York, NY  10022
(212) 752-8000
(212) 752-8393 Facsimile

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

BASIS OF APPELLATE JURISDICTION.............................................................................. 3

STATEMENT OF ISSUES PRESENTED................................................................................ 4

STANDARD OF APPELLATE REVIEW................................................................................ 5

STATEMENT OF THE CASE.................................................................................................. 7

STATEMENT OF FACTS ........................................................................................................ 9

ARGUMENT............................................................................................................................. 23

**POINT I**    THE RETENTION ORDER WAS NOT AN UNCONDITIONAL PRE-APPROVAL ORDER AUTHORIZING RIKER'S RETENTION .......... 23

**POINT II**    EVEN IF SECTION 328(a) WERE APPLICABLE, THE TERMS AND CONDITIONS OF RIKER'S EMPLOYMENT HAVE PROVEN TO BE IMPROVIDENT IN LIGHT OF DEVELOPMENTS NOT CAPABLE OF BEING ANTICIPATED AT THE TIME OF THE FIXING OF THE TERMS OF ITS EMPLOYMENT ............................................................. 29

**POINT III**    IRRESPECTIVE OF WHETHER THE COURT APPLIES SECTION 328(a) OR SECTIONS 330 AND 331 OF THE BANKRUPTCY CODE TO DETERMINE RIKER'S FEE APPLICATION, THE FEE AWARD TO RIKER IS EXCESSIVE AND MUST BE SIGNIFICANTLY REDUCED.......................................................................................................... 34

CONCLUSION........................................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

### CASES

Pages

<u>In re Airspect Air, Inc.</u>, 288 B.R. 464 (6th Cir. BAP 2003), <u>rev'd on other grds</u>, 385 F.3d 915 (6th Cir. 2004)................................................................................................31

<u>American Geophysical Union v. Texaco Inc.</u>, 60 F.3d 913 (2d Cir. 1994)................................7

<u>Banker v. Nighswander, Martin & Mitchell</u>, 37 F.3d 866 (2d Cir. 1994)..................................7

<u>In re Begun</u>, 162 B.R. 168 (Bankr. N.D. Ill. 1993)..............................................................35, 36

<u>Benassi v. First Nat'l Bank of Babbit (In re Benassi)</u>, 72 B.R. 44 (D. Minn. 1987)................24

<u>In re Chiapetta</u>, 159 B.R. 152 (Bankr. E.D. Pa. 1993)......................................................30, 31

<u>In re Confections By Sandra, Inc.</u>, 83 B.R. 729 (9th Cir. BAP 1987)......................................29

<u>Denton v. Hyman (In re Hyman)</u>, 335 B.R. 32 (S.D.N.Y. 2005) ...............................................5

<u>In re Financial News Network, Inc.</u>, 134 B.R. 732 (Bankr. S.D.N.Y. 1991) ...........................30

<u>Friedman Enterprises v. B.U.M. International, Inc. (In re B.U.M. International, Inc.)</u>, 229 F.3d 824 (9th Cir. 2000) ........................................................................................25, 26

<u>In the Matter of Lytton's</u>, 832 F.2d 395 (7th Cir. 1987) ........................................................27

<u>Leading Manufacture Pte. Ltd. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)</u>, 313 B.R. 565 (S.D.N.Y. 2004)......................................................................................6

<u>In re Megan-Racine Associates, Inc.</u>, 198 B.R. 650 (N.D.N.Y. 1996), <u>rev'd on other grds</u>, 102 F.3d 671 (2d Cir. 1996)....................................................................................6

<u>Metzen v. United States</u>, 19 F.3d 795 (2d Cir. 1994) .................................................................7

<u>Montgomery County Maryland v. Metromedia Fiber Network, Inc.</u>, 326 B.R. 483 (S.D.N.Y. 2005) ........................................................................................................6

<u>Nischwitz v. Miskovic (In re Airspect Air, Inc.)</u>, 385 F.3d 915 (6th Cir. 2004)................24, 25

<u>Official Committee of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)</u>, 335 B.R. 22 (S.D.N.Y. 2005) ..................................................................6

<u>In re Omegas Group, Inc.</u>, 195 B.R. 875 (Bankr. W.D. Ky. 1996) ..........................................30

Ramirez v. Fuselier (In re Ramirez), 183 B.R. 583 (9th Cir. BAP 1995) ..................................6

In re Schubert, 143 B.R. 337 (S.D.N.Y. 1992) ..........................................................................36

Sun Insurance Co. of New York v. Consolidated Companies, Inc. (In re Consolidated
    Companies, Inc.), 185 B.R. 223 (E.D. La. 1995), aff'd, 106 F.3d 396 (5th Cir.
    1996) ........................................................................................................................................6

United States v. McCombs, 30 F.3d 310 (2d Cir. 1994) .............................................................7

United States v. United States Gypsum Co., 333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746
    (1948)........................................................................................................................................6

Unsecured Claims Estate Rep. of Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent
    Inc.), 324 B.R. 479 (S.D.N.Y. 2005) .......................................................................................6

In re XO Communications, Inc., 323 B.R. 330 (Bankr. S.D.N.Y. 2005) .................................29

Zolfo, Cooper & Co. v. Sunbeam-Oster Company, Inc., 50 F.3d 253 (3rd Cir. 1995) ......26, 27

## STATUTES

11 U.S.C. § 328(a) ....................................................................................................................29

28 U.S.C. §158(a)(1)....................................................................................................................3

Fed. R. Civ. P. 52(a) ...................................................................................................................6

## PRELIMINARY STATEMENT

This Appellate brief is submitted on behalf of the Official Committee of Unsecured Creditors (the "Committee") for SmartWorld Technologies, LLC, SmartWorld Communications, Inc. and Freewwweb LLC (the "Debtors"), in support of its cross-appeal from so much of the Order dated March 23, 2007 and entered on March 28, 2007, of the United States Bankruptcy Court, Southern District of New York, Honorable James M. Peck, United States Bankruptcy Judge (the "Appealed Order"), that awarded legal fees of $1,207,816 and expenses of $73,901.18 to Riker, Danzig, Scherer, Hyland & Perretti, LLP ("Riker"). The brief is also submitted in opposition to Riker's appeal of the Appealed Order.

The Committee submits that the factual findings made by the Bankruptcy Court to support its determination under 11 U.S.C. § 328(a) that Riker's original retention was improvident in light of anticipated events was correct and should not be upset on appeal. The Bankruptcy Court drew its factual conclusions from the record of multiple proceedings held before it, including a contested confirmation hearing in which Riker, and not the Debtors' bankruptcy counsel, took the laboring oar in trying to upset a Committee sponsored plan, which incorporated the very settlement from which it now seeks a fee. It took six years to reach confirmation in a case in which the Debtors ceased business operations almost on the day they filed their petitions. That the bankruptcy case was so protracted and so costly was in large part due to Riker's activities. At the purported behest of the equity – in a case in which the Debtors' lack of solvency was known from the outset – Riker continually opposed all meaningful steps by the Committee to reach an agreement with Juno Online Services, Inc. ("Juno"), which would result in cash being brought into estates which had none.

When Riker was retained in November, 2000 with the Committee's approval, it was the expectation of those parties who held meaningful economic stakes in this case (i.e., the

Committee and WorldCom, Inc. ("WorldCom"), that Riker would play a constructive role in protecting the estates' interests in its disputes with Juno, that those disputes would be swiftly resolved, and that Riker would recognize that as a fiduciary to an insolvent estate, it should not substitute its own judgment for that of the creditors to whom, ultimately, it was answerable. That Riker would so consistently fail to heed the Committee's wishes and disregard its responsibility could not have been anticipated. It took six difficult years, and the expenditure of enormous costs relative to the assets available for distribution to unsecured creditors, before the Committee could bring closure to the case. Along the way, Riker fought resolution at every turn.

But while the Committee submits the Bankruptcy Court was correct in finding that the terms of Riker's original retention were improvident within the meaning of section 328(a) of the Bankruptcy Code, it submits that the lower court committed error by awarding Riker the exceedingly generous fee of $1.2 million. It is the Committee's position that under the terms under which Riker was retained, it was not entitled to any fee. An award of $1.2 million, let alone the more than $2.4 million Riker seeks, therefore was in error.

The record below is clear. Riker's compensation was conditioned upon it being "successful" in the litigation with Juno; and even an unduly expansive or liberal definition of success in this case would still not warrant a fee to Riker of $1.2 million.

The monies available in this case and from which Riker seeks its fee came from the efforts of the Committee, which after six years of being disenfranchised by the Debtors' principals and Riker, was able to fashion a settlement with Juno. The Committee then prepared a disclosure statement and a plan which incorporated the settlement, obtain approval of the disclosure statement over Riker's objection, solicited creditor acceptances to the plan, and had the plan confirmed, all over Riker's objections. After confirmation finally occurred, and for the

2

first time in six years there was money in the estates, Riker filed its final fee application seeking approximately $2.4 million from the Juno settlement monies.  In no small twist of irony, in its application, Riker effectively took credit for the settlement it consistently and vigorously opposed, claiming entitlement under its retention to approximately one-third of the monies.[1] Had Riker been successful in its efforts at derailing the settlement, this money would not be there for Riker to claim the lion's share.

In short, Riker cannot demonstrate that the condition of its fee, that it be successful in the Juno Action, was met.  Under the circumstances, the Bankruptcy Court should not have awarded Riker any fee, or certainly not the overly generous fee of $1.2 million.[2]

## BASIS OF APPELLATE JURISDICTION

The United States District Court for the Southern District of New York (the "District Court") has jurisdiction to hear and determine this appeal pursuant to 28 U.S.C. §158(a)(1) which provides, in pertinent part, that:

> The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to bankruptcy judges under section 157 of [Title 28].  An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

28 U.S.C. § 158(a)(1).

All jurisdictional requirements of 28 U.S.C. §158(a)(1) are met with respect to the Appealed Order, since it is a final order entered in a bankruptcy case referred to the Bankruptcy

---

[1] If Riker received the full amount requested on appeal, after almost seven years unsecured creditors will be left with a few pennies for each dollar of claim.

[2] The fee awarded to Riker equaled a full "lodestar" award, without reduction.

3

Court under 28 U.S.C. §157, and was entered by a bankruptcy judge serving in the Southern District of New York.

## STATEMENT OF ISSUES PRESENTED

The following are the issues presented by this appeal:[3]

1.      Whether the Bankruptcy Court erred in reviewing the fee application filed by Riker under, and applying the standards of, section 328(a) of the Bankruptcy Code as opposed to sections 330 and 331 of the Bankruptcy Code?

2.      To the extent Riker was retained pursuant to section 328(a) of the Bankruptcy Code, whether the Bankruptcy Court's factual findings, *inter alia,* that the retention proved improvident in light of developments not capable of being anticipated at the time of Riker's retention were not clearly erroneous?

3.      Whether the Bankruptcy Court erred in awarding legal fees of $1,207,816 and expenses of $73,981.18 (collectively, the "Fee Award") to Riker, under either section 328 or sections 330 and 331 of the Bankruptcy Code, in light of the fact that any fee to Riker was contingent upon Riker's successful prosecution of the Juno Action?

4.      Whether the Bankruptcy Court erred in granting the Fee Award, under either section 328 or sections 330 and 331 of the Bankruptcy Code, given that all of the money in the Debtors' estates came as a result of a settlement of the Juno Action engineered by the Committee?

5.      Whether the Bankruptcy Court erred in awarding Riker any fee whatsoever, under either section 328 or sections 330 and 331 of the Bankruptcy Code, in light of the order

---

[3] All capitalized terms used in this section but not otherwise defined herein shall have the meanings as defined in the sections of this brief that precede or follow this section.

authorizing Riker's retention which, among other things, incorporated the Debtors' application to retain Riker and which represented that Riker would only be entitled to compensation in the event it successfully prosecuted the Juno Action?

6.      Whether the Bankruptcy Court erred in granting the Fee Award, under either section 328 or sections 330 and 331 of the Bankruptcy Code, given that Riker played no role whatsoever in obtaining the funds from which the Fee Award would be paid, stymied all attempts to resolve the Juno Action and played a counter-productive role in the Debtors' cases?

## STANDARD OF APPELLATE REVIEW

The issues presented by this appeal consist of both issues of law, issues of fact and mixed issues of law and fact. The District Court will need to decide whether the Bankruptcy Court's conclusion that section 328(a) of the Bankruptcy Code was the proper statutory provision under which to review Riker's fee application was correct as a matter of law. If the Court decides that section 328(a) of the Bankruptcy Code is applicable to the review of Riker's fee application, the District Court will then have to review the Bankruptcy Court's factual findings that Riker's retention proved improvident in light of developments not capable of being anticipated at the time of the retention under the clearly erroneous standard. Finally, regardless of whether section 328(a) or sections 330 or 331 of the Bankruptcy Code are applicable to Riker's fee application, the District Court must decide the mixed question of law and fact as to whether, under either of those sections, the Bankruptcy Court erred in granting the Fee Award given that any fees to Riker were contingent upon Riker's successful prosecution of the Juno Action, that Riker played no role whatsoever in obtaining the funds from which the Fee Award would be paid, stymied all efforts to resolve the Juno Action and played a counter-productive role in the Debtors' cases.

As to the Bankruptcy Court's legal conclusions, it is well settled that a district court is to review such conclusions on a *de novo* basis. See, e.g., Denton v. Hyman (In re Hyman), 335 B.R.

32 (S.D.N.Y. 2005); Official Committee of Unsecured Creditors of Enron Corp. v. Enron Corp.

(In re Enron Corp.), 335 B.R. 22 (S.D.N.Y. 2005); Montgomery County Maryland v.

Metromedia Fiber Network, Inc., 326 B.R. 483 (S.D.N.Y. 2005); Unsecured Claims Estate Rep.

of Teligent, Inc. v. Cigna Healthcare, Inc. (In re Teligent Inc.), 324 B.R. 479 (S.D.N.Y. 2005);

Leading Manufacture Pte. Ltd. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.), 313 B.R. 565

(S.D.N.Y. 2004). Similarly, a bankruptcy court's interpretation and application of a statute

constitutes a conclusion of law, which a district court also reviews on a *de novo* basis. See In re

Megan-Racine Associates, Inc., 198 B.R. 650 (N.D.N.Y. 1996), rev'd on other grds, 102 F.3d

671 (2d Cir. 1996); Sun Insurance Co. of New York v. Consolidated Companies, Inc. (In re

Consolidated Companies, Inc.), 185 B.R. 223 (E.D. La. 1995), aff'd, 106 F.3d 396 (5th Cir.

1996); Ramirez v. Fuselier (In re Ramirez), 183 B.R. 583 (9th Cir. BAP 1995), dism. on other

grds, 201 F.3d 444 (9th Cir. 1999). Accordingly, the District Court must review the legal

conclusion of the Bankruptcy Court that section 328(a) applies to Riker's fee application on a *de

novo* basis.

It is equally well settled that a district court is to review a bankruptcy court's factual

findings on a clearly erroneous basis. Indeed, this is prescribed by Rule 52(a) of the Federal

Rules of Civil Procedure, made applicable to bankruptcy cases under Bankruptcy Rule 7052.

Rule 52(a) provides, in part, that "[f]indings of fact, whether based on oral or documentary

evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the

opportunity of the trial court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52(a).

A factual finding is clearly erroneous when, even though there is evidence to support it, an

appellate court "is left with the definite and firm conviction that a mistake has been committed."

United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746

(1948); Metzen v. United States, 19 F.3d 795 797 (2d Cir. 1994). Thus, the Bankruptcy Court's findings that the terms of Riker's retention proved improvident in light of unanticipated events can only be set aside if the District Court concludes that such findings were clearly erroneous.

While the circuit courts are split on the standard of review of mixed questions of law and fact, the Second Circuit reviews such mixed questions of law and fact on a *de novo* basis. See, e.g., American Geophysical Union v. Texaco Inc., 60 F.3d 913 (2d Cir. 1994); Banker v. Nighswander, Martin & Mitchell, 37 F.3d 866 (2d Cir. 1994); United States v. McCombs, 30 F.3d 310 (2d Cir. 1994). Accordingly, the District Court must review whether the Bankruptcy Court should have awarded the Fee Award at all, or erred in fixing the amount of the Fee Award, in light of the success requirement of Riker's retention on a *de novo* basis as well.

## STATEMENT OF THE CASE

On June 29, 2000, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 19, 2000, the Bankruptcy Court held a hearing at which time it approved, on the record, a sale of the subscriber base of one of the debtors, Freewwweb LLC (the "FW Subscribers") to Juno. Soon thereafter a dispute arose between Juno and the Debtors over the terms of the sale and the respective obligations of the parties. In reaction to these disputes, Juno commenced an adversary proceeding (the "Juno Action"). On or about August 21, 2000 Juno served and filed its amended complaint in the Juno Action.

By Order to Show Cause dated November 9, 2000, the Debtors moved for an order retaining Riker as special litigation counsel to represent them solely in the Juno Action. On November 14, 2000 the Court conducted a hearing on the Debtors' retention application and on November 16, 2000 it entered an order authorizing and approving the retention (the "Retention Order").

After the commencement of the Juno Action, Juno, WorldCom, which was owed money for post-petition services provided to the Debtors' estates, and the Committee negotiated a settlement. This settlement was reached after a Court-ordered mediation of the Juno Action in which the Debtors (and Riker as counsel) participated. The Debtors refused to accept the settlement (the "Original Settlement") and over their objection Juno, WorldCom, and the Committee moved for approval of the Original Settlement under Bankruptcy Rule 9019. The Bankruptcy Court, over the Debtors' objection, entered an order approving the Original Settlement, the District Court affirmed the Bankruptcy Court's approval of the Original Settlement and the Debtors appealed to the Second Circuit Court of Appeals. By decision dated September 12, 2005, the Second Circuit reversed both the District Court and the Bankruptcy Court's approval of the Original Settlement and remanded the Juno Action to the Bankruptcy Court. In relevant point, and in a decision of first impression, the Second Circuit held that a creditor's committee could intervene in an adversary proceeding, but it could not settle the proceeding over a debtor's objection.

Subsequent to the remand of the Juno Action the parties recommenced discovery. Approximately seven months after the re-start of discovery, Juno and the Committee re-commenced their settlement discussions which resulted in an agreement in late July, 2006. On August 4, 2006, the Committee filed a Disclosure Statement pursuant to section 1125 of the Bankruptcy Code with respect to the Committee's proposed Chapter 11 Plan of Liquidation dated August 4, 2006. The Committee thereafter filed an Amended Chapter 11 Plan of Liquidation (the "Plan"), together with an Amended Disclosure Statement, on October 16, 2006. The Plan encompassed the settlement it had reached with Juno (the "Juno Settlement"). By order dated October 23, 2006, the Bankruptcy Court approved the Amended Disclosure Statement.

8

The Debtors objected to confirmation of the Plan on the ground that the Juno Settlement was not in the best interests of the creditors. Nevertheless, on December 28, 2006, the Bankruptcy Court entered an order confirming the Committee's Plan over the Debtors' objection.

On January 18, 2007, Riker filed its application for allowance and payment of approximately $2.4 million in fees and expenses (the "Fee Application"). On February 14, 2007, the Committee filed an objection to Riker's Fee Application and, on February 19, 2007, Riker filed its reply.

The Bankruptcy Court conducted two hearings on Riker's Fee Application, on February 21, 2001 and March 22, 2007. At the March 22 hearing the Court rendered a decision authorizing a Fee Award of approximately $1.2 million to Riker. This award was memorialized in the Appealed Order dated March 23, 2007 and entered on March 28, 2007. Riker filed an appeal of the Appealed Order on April 2, 2007 and, on April 4, 2007, the Committee filed a cross-appeal from so much of the Appealed Order which awarded fees and expenses to Riker. Riker's Record on Appeal and Statement of Issues to be Presented on Appeal was filed on April 12, 2007, and the Committee's Statement of Issues on Appeal and Cross-Appeal and Designation of Additional Items for the Record was filed on April 19, 2007.

## STATEMENT OF FACTS

This appeal is from an order of the Bankruptcy Court awarding approximately $1.2 million in fees and expenses to Riker on Riker's request for approximately $2.4 million in fees and expenses. The Riker fee request is based on Riker's representation of the Debtors as special litigation counsel in the Juno Action. As will be discussed below, while the Committee agrees with the Bankruptcy Court's findings that it would be improvident in light of unanticipated events to grant Riker $2.4 million (depriving unsecured creditors of any meaningful recovery), it disagrees with the Bankruptcy Court's conclusion that Riker was entitled to any fee, given that

9

Riker's fee was contingent upon its successful prosecution of the Juno Action. All of the money in the Debtors' estates came as a result of a settlement of the Juno Action, engineered by the Committee over Riker's efforts to scuttle that settlement.

On the eve of the Debtors' bankruptcy filings, the Debtors and Juno executed a term sheet (the "Term Sheet") which provided for the sale of the FW Subscribers to Juno for cash, or at Juno's option, stock and cash (a copy of the Term Sheet is annexed as Exhibit A to Item 19 of the Joint Appendix, p. A-0718[4]). More specifically, the Term Sheet provided that Juno would make payments to the Debtors on each "Measurement Date" based on the number of "Qualified Subscribers" existing on such date. The Measurement Dates were defined in the Term Sheet as October 31, 2000, November 30, 2000, December 31, 2000 and the last day of each calendar quarter during 2001. Additionally, in the event that Juno ceased accepting referrals of FW Subscribers prior to December 31, 2000, the effective date of such termination would also constitute a Measurement Date. Juno ceased accepting the FW Subscribers as of December 31, 2000, one of the already-defined Measurement Dates.

In order to be a Qualified Subscriber, a FW Subscriber would have had to have been a Juno subscriber for at least ninety (90) days and have used the Juno internet service for an aggregate of thirty (30) minutes or more during the thirty (30) days immediately preceding an applicable Measurement Date. By way of example, in order for a former FW Subscriber to be a Qualified Subscriber under the Term Sheet as of the October 31, 2000 Measurement Date, he or she would have had to become a Juno subscriber prior to July 31, 2000, remained a Juno subscriber between July 31, 2000 and October 31, 2000, and would have had to have used the

---

[4] References are to the Joint Appendix filed with the District Court on May 25, 2007.

Juno web service for an aggregate of thirty (30) minutes or longer during the month of October 2000.

The Term Sheet required that Juno make payments on each Measurement Date to the Debtors on a per-subscriber basis of $10.00 in cash plus $30.00 in Juno stock for each of the first 250,000 Qualified Subscribers, $10.00 in cash plus $40.00 in Juno stock for each of the next 100,000 Qualified Subscribers, and $50.00 in Juno stock for each Qualified Subscriber in excess of the first 350,000 Qualified Subscribers. To the extent that a subscriber was a Qualified Subscriber on a prior Measurement Date, no payment would be made for that subscriber on the next Measurement Date even if he was still a Qualified Subscriber on the second Measurement Date. In other words, a former FW Subscriber could only be counted as a Qualified Subscriber once.

Immediately after the Petition Date, the Debtors moved for approval of the Term Sheet and the sale of the FW Subscriber base to Juno. Bidding procedures were approved by the Bankruptcy Court on July 12, 2000 and a hearing was conducted on July 19, 2000 to approve the sale. No other bidders appeared at the sale hearing and the Court approved the sale to Juno. Upon approval of the sale, Juno and the Debtors began the transition and referral of FW Subscribers to Juno. However, numerous disputes arose between the Debtors and Juno during the transition period. As a result of those disputes, and the parties mutual allegations of breach of the Term Sheet, a separate written order approving the sale was never submitted to, nor entered by, the Bankruptcy Court, although the Debtors and Juno both agreed that the Term Sheet was binding on the parties.

The parties' dispute led to Juno commencing the Juno Action against the Debtors on or about August 16, 2000, with the filing of an adversary proceeding complaint, subsequently

11

amended on or about August 21, 2000 (the "Amended Complaint")  (a copy of the Amended

Complaint is annexed as Exhibit B to Item 24 of the Joint Appendix, p. A-1492).  Juno sought a

judgment declaring that its actions in implementing the Term Sheet were proper, that it owed the

Debtors only those amounts required by the Term Sheet, and that it was not contractually

obligated to assist the Debtors in accounting for the Debtors' obligations, if any, to pay certain

"Master Distributors" for referrals to Juno.  Juno sought damages for the Debtors' alleged breach

of the Term Sheet and for alleged fraudulent misrepresentations, and a determination that the

Debtors breached their duty of good faith and fair dealing in connection with the Term Sheet.

Considering Juno's Amended Complaint as a whole, it is clear that Juno's primary

objective was to have the Bankruptcy Court declare that it was only obligated to honor the Term

Sheet and to pay for Qualified Subscribers in the manner and in the amount set forth in the Term

Sheet.  Juno seemed to be pleading for the Bankruptcy Court to let it pay what was legitimately

owed and then let it go on its way.  Indeed, in the second cause of action for declaratory relief in

the Amended Complaint, Juno asked that a judgment be entered against it when it agreed that, as

provided in the Term Sheet, "Juno is obligated to compensate Defendants solely for Qualified

Subscribers, determined as of the applicable Measurement Date" (Exhibit B to Item 24 of the

Joint Appendix, p. A-1502; emphasis supplied).  The first and third claims for relief in the

Amended Complaint were also for declaratory relief and sought no affirmative recovery against

the Debtors.

The Amended Complaint also set forth several breach of contract claims, but upon close

examination they were really nothing more than assertions that the Debtors' failure to properly

perform under the Term Sheet reduced the number of Qualified Subscribers which Juno

received.  This meant that Juno would have to pay the Debtors less, not more, and Juno never seriously pursued these claims.

By order to show cause dated November 9, 2000, the Debtors moved for an order retaining Riker as special litigation counsel in the Juno Action.  The motion was supported by the "Affidavit of [Debtor's bankruptcy counsel] Douglas T. Tabachnik, Pursuant to Local Bankruptcy Rule 9077-1 In Support of Order to Show Cause" (the "Tabachnik Affidavit") and the Debtors' Application, which together constitute Exhibit A to Item 24 of the Joint Appendix, p. A-1475.  In paragraph 6 of the Debtors' Application, the Debtors represented to the Court and interested parties that Riker "will not seek any monies from the Estate, including reimbursement of disbursements, <u>unless</u> <u>it</u> <u>is</u> <u>successful</u>" (Joint Appendix, p. A-1480; emphasis supplied).  This representation was echoed by Mr. Tabachnik who stated under oath in his affidavit that "Riker Danzig has agreed to take up the matters concerning the disputes with Juno on a contingency basis, with no funds required of the Debtors unless <u>Riker</u> <u>is</u> <u>successful</u> in obtaining a result for the estates" (Joint Appendix, p. 1477; emphasis supplied).  Riker did not dispute at the time of its retention that a successful resolution of the Juno Action through its efforts was a condition to its receiving a fee.

The Riker retention application was heard on limited notice, and the United States Trustee ("UST") filed an objection opposing the contingent fee arrangement.  However, the UST requested that should the Court permit a contingent fee retention, any order approving the retention require Riker to file an appropriate fee application consistent with the Court's rules and the UST's guidelines.  That UST also reserved the right to object to any Riker fee application on "'reasonableness' grounds pursuant to 11 U.S.C. § 330" (a copy of the UST's objection is attached as Item 5 of the Joint Appendix, p. A-0029).

On November 14, 2001, the Court conducted a hearing on the proposed Riker retention (the transcript of the hearing is attached as Item 7 of the Joint Appendix, p. A-0042). The transcript demonstrates that the creditors were concerned that Riker not receive a "windfall" through a contingent fee arrangement. The record reflects that creditors were actively involved in settlement talks with Juno and were hopeful that these discussions would be successfully concluded (Joint Appendix, p. A-0063, 1.17-p. A-0064, 1.3).

In the meantime, the Committee and WorldCom wanted litigation counsel appointed to protect the estates' interests in the Juno Action. The strategy was apparent: the Debtors pursue the litigation while settlement discussions continued, but should a settlement be reached, Riker and the Debtors would "step down" in favor of settlement. In recognition of the need for Riker to quickly immerse itself in the Juno Action, but aware that an early settlement seemed likely and Riker's time commitment might not end up being that substantial, the parties agreed to a proposal which increased Riker's percentage recovery the longer the matter continued, which proposal was included in the "Rothschild Letter" (Joint Appendix, p. A-1484 – A. 1485). This arrangement however, carried with it the consequence that the longer the litigation lasted, the more Riker could earn.

At the hearing, the UST pressed its request that the Bankruptcy Court require Riker to file a fee application, and the Court did direct Riker to file its time records and a fee application should it be successful in the Juno Action (Joint Appendix, p. A-0068). The Court agreed with a comment by one counsel that "[t]he fee application will be consistent with the contingency fee agreement and lay out what the proceeds were, et cetera, as opposed to the typical fee application" (Joint Appendix, p. A-0069). Thus, the Bankruptcy Court directed Riker to file a fee application, although the Court advised that the assessment of services on a "lodestar" basis

14

would not be necessarily the primary criteria for awarding fees. Instead the Court noted that a "[c]ontingency fee means that the attorney must be successful in order to be paid" and "<u>if he doesn't bring in anything, he doesn't get paid at all</u>" (Joint Appendix, p. A-0067, emphasis supplied).

There was no reference made to section 328(a) of the Bankruptcy Code during the hearing and the record as a whole suggests that Judge Blackshear was reserving, for further consideration, what criteria he would use to approve a fee to Riker at some future time. However, the Court made it plain, and Riker raised no voice in objection, that unless Riker was the agent for bringing cash into the estates, it would not be entitled to a fee.

On November 16, 2000, the Bankruptcy Judge signed the two paragraph Retention Order, a copy of which is attached as Item 8 of the Joint Appendix, p. A-0123. The first paragraph was limited to approving Riker's retention as special litigation counsel in connection with contested matters involving Juno. In the second paragraph, however, the Court ordered that Riker's compensation would be "fixed upon further application" with its compensation to be "in accordance with" the "within application" and the "Rothschild Letter" (Joint Appendix, p. A-0124). The twin references, to the Rothschild letter and the Debtor's retention application, demonstrates that the court below, while reserving the right to award Riker's fee on any statutorily permitted basis, intended to consider the request in light of the contingent nature of the retention, <u>i.e.</u> "in accordance with" the Rothschild Letter, and the need for Riker to be successful, <u>i.e.</u> "in accordance with" the application.

Approximately one month after it was formally retained, on or about December 19, 2000, Riker filed an answer on behalf of the Debtors in the Juno Action (a copy of the answer is annexed as Exhibit F to Item 24 of the Joint Appendix, p. A-1530). The answer included six

15

counterclaims which on their face were meritless. The Debtors admitted in the answer that the Bankruptcy Court approved the Term Sheet on July 19, 2000 and that the Term Sheet was binding on them. Indeed, the first of the Debtors' six counterclaims was for declaratory relief requesting generally that the Court "issue an Order defining the parties [sic] obligations under the Term Sheet," listing sixteen separate "declarations" that the Court should make (Joint Appendix, p. A-1559-A-1561). These requests were an obvious response to Juno's declaratory relief claims and demonstrate the mutual desire of the parties to settle their disputes through a court interpretation of the Term Sheet.

The second counterclaim was a jumble of facts and allegations asserting claims for conversion, breach of contract and breaches of fiduciary duties, all within the same claim for relief. The substance of the allegations in this counterclaim was that Juno made improper demands under the Term Sheet and that Juno sought to "obtain the benefits of the Term Sheet without compensation to SmartWorld" (Joint Appendix, p. A-1562). Riker, on behalf of the Debtors, demanded that the Court enter an order with ten separate findings including that Juno "tender to SmartWorld that compensation required under the Term Sheet for 1.7 million Qualified Subscribers" (Joint Appendix, p. A-1563).

The third counterclaim lumped claims for breach of contract with claims for breach of fiduciary duty. Again, referring to the Term Sheet, Riker claimed that "Juno breached the provisions and spirit of the Term Sheet in failing to provide adequate technical support to SmartWorld by means of which the purposes of the Term Sheet may have been effectuated." Id. Additional allegations included assertions that "Juno breached the provisions and spirit of the Term Sheet in failing to establish a transfer method that would permit a full and accurate accounting of all referrals of FW Subscribers to the Juno site" (Joint Appendix, p. A-1564), that

16

Juno made negligent or false representations concerning its technical capacity to accept subscribers, that Juno "breached the provisions and spirit of the Term Sheet by attempting to suppress the number of Qualified Subscribers for which it would be liable to compensate SmartWorld under the Term Sheet" and that Juno's actions had a "tendency to, and did in fact, act to deny SmartWorld the benefit of its bargaining with Juno." Id. In this counterclaim, Riker sought compensatory damages "in an amount to be determined at trial," punitive damages and attorneys fees (Joint Appendix, p. A-1564-A-1565).

The fourth counterclaim was also styled as one for breach of contract and breach of fiduciary duty, although the substance of the claim for relief was that Juno had not fulfilled its obligations under the Term Sheet. In this counterclaim, Riker alleged that "Juno willfully and/or negligently breached the provisions and spirit of the Term Sheet in failing to tender cash advances to SmartWorld for each Referred FW Subscriber as expressly required by the Term Sheet." According to Riker, in agreeing to "tender the referenced payments, Juno assumed a fiduciary role with respect to SmartWorld" (Joint Appendix, p. A-1565). Again, compensatory damages as well as attorneys' fees were sought. The fifth counterclaim was styled as yet another breach of contract claim, this time with tortuous interference with business relations added to the mix. According to Riker, Juno's "willful, deliberate, intentional and/or negligent actions" made it impossible to determine how many subscribers may have been referred to Juno by the master distributors (Joint Appendix, p. A-1566). Riker alleged that Juno's actions "effectively destroyed SmartWorld's referral system as an asset to the corporation." Id. Additional allegations of "breach of fiduciary duty" and violation of the "implied covenant and good faith and fair dealing" were thrown into the pot. Finally, Riker added one more claim for breach of contract, this time joined with a claim of unjust enrichment. The essence of this last claim was

that Juno was "unjustly enriched to the extent that it obtained new Juno accounts from FW Subscribers in such a manner as to avoid its payment obligations under the Term Sheet." This claim on its face seems to make no sense in that Juno started the whole adversary proceeding with a request that the Court determine that it be required to pay for Qualified Subscribers (Joint Appendix, p. A-1568).

After issue was joined in the Juno Action, the Committee, Juno and WorldCom continued their settlement dialogue to resolve the disputes arising out of the Court-approved Term Sheet. During this period, the Bankruptcy Court limited pretrial discovery in the Juno Action. Finally, after the Bankruptcy Court appointed a mediator, the Committee, Juno and WorldCom reached the Original Settlement, which provided for a payment by Juno of $5,500,000, $500,000 of which was earmarked to pay post-petition obligations to WorldCom. Contrary to what was anticipated at the outset of Riker's retention, the Debtors refused to go along.

Claiming that the Original Settlement was inadequate, and substituting their own judgment for that of the creditors, the Debtors and Riker appealed the Bankruptcy Court's order approving the Original Settlement to the District Court, which affirmed the Bankruptcy Court. A further appeal from the District Court's affirmation to the United States Court of Appeals for the Second Circuit ("Court of Appeals"), however, resulted in a reversal, in September, 2005, of the Bankruptcy Court's approval order.

In its decision, the Court of Appeals held that a committee, as an intervenor in an adversary proceeding, did not have the standing to settle the adversary proceeding over the objection of a debtor. In addition, the Court of Appeals was critical of the refusal of the Bankruptcy Court to allow the Debtors to take "meaningful discovery," and of the record created by the Bankruptcy Court, used to support the Bankruptcy Court's findings.

18

The adversary proceeding was remanded to the Bankruptcy Court and the parties recommenced discovery. Months after the restart of discovery, Juno and the Committee entered into settlement negotiations. The Committee used the discovery to take a fresh look at the Juno Action and the respective positions of the litigants. Ultimately, a settlement was reached pursuant to which Juno would pay $6,250,000 to the Debtors' estates (the "Juno Settlement"). If there was no appeal of an order confirming the Plan, the Juno Settlement would increase to $6,500,000 (Joint Appendix, p. A-0503-89). Approval of the Juno Settlement was to be sought through the Plan to be filed by the Committee pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.

In assessing the reasonableness of any settlement with Juno, one of the most difficult issues the Committee confronted was how to verify Juno's representation as to the number of subscribers it was obligated to pay for under the Term Sheet, i.e. the Qualified Subscribers. As part of its pre-settlement due diligence, the Committee's counsel obtained access to and reviewed a large number of documents from Juno, including documents containing contemporaneous calculations of the number of FW Subscribers who opened Juno accounts in 2000 (over 400,000) and the number of those who "Qualified," which was shown in the documents as 132,032 (Joint Appendix, p. A-0503-90). Assuming the accuracy of Juno's count of Qualified Subscribers, the Committee calculated that the consideration due under the Term Sheet was $5,037,525. The Juno Settlement exceeded this number by $1,463,000, or approximately 29%.

Likewise, the Committee was satisfied that the count of Qualified Subscribers obtained from Juno was substantially accurate. Moreover, as part of the Juno Settlement, Juno agreed to provide sworn testimony before the Bankruptcy Court confirming the accuracy of the count. Id. While absolute verification of the subscriber count would require the Debtors, in the Juno

19

Action, to retain their own computer experts who would have to painstakingly analyze, review and recreate Juno's vast database, this was not possible. The Debtors made no attempt to retain any experts in the Juno Action and in the Committee's view, it was almost a certainty that they would not. For one thing, hiring a qualified expert to undertake this monumental task would be extremely costly. These estates had no money and no assets, other than the proceeds from the Juno Settlement. There was, moreover, no guaranty that the experts would be able to perform the type of analysis required or that their conclusions would be result in any material changes to the count of Qualified Subscribers (Joint Appendix, p. A-0503-91).

In reaching the Juno Settlement, which the Committee believed to be fair and reasonable and advantageous to the Debtors' estates and their creditors, the Committee specifically considered the following factors:

- This case was six years old and creditors received no distributions on account of their claims.

- It was the Committee's belief based upon its review of the facts, deposition testimony and documents that Juno appeared to have the far better arguments with respect to its obligations being limited to pay only for Qualified Subscribers under the Term Sheet.

- The assorted claims made by the Debtors in their counterclaims appeared to be vague, hard to quantify in terms of damage amounts and unsupported by any testimony or documents that the Debtors offered during the course of discovery.

- In agreeing to the settlement with Juno, the Committee considered that Juno would be required to pay interest on the amounts due under the Term Sheet to the date of judgment.

- The Committee credited Juno's assertion that pursuant to a Bankruptcy Court order placed on the record of a hearing on July 19, 2000, Juno was entitled to reduce its payments to the Debtors by certain authorized post-petition payments it made to telecommunications providers in the approximate amount of $829,000. The Juno Settlement contained a representation from Juno that these amounts were actually paid and an indemnity for breach of the representation.

20

- The Committee uncovered no evidence to support the Debtors' assertion that Juno prevented them from identifying Qualified Subscribers. Certainly Juno did not present any barriers to the Committee's attempt to identify those subscribers.

- The Committee concluded that there was little merit in the Debtors' assertion that Juno had "deliberately tried to get out of the sale transaction." Indeed, central to the Juno Action was Juno's request that the Court declare its obligations under the Term Sheet, a position at odds with the notion that it was trying to walk away from the agreement.

- There seemed to be no evidence, and it made little sense, that Juno received a "better offer" for the FW Subscribers. There was no evidence as from whom that offer might have come from, what the offer was and how anyone other than the Debtors could have provided the mechanism to transfer the FW Subscribers to Juno.

- The settlement that the Committee negotiated with Juno represented a litigation premium of $1.5 million over and above that to which the Debtors would have received had Juno only paid the per-Qualified Subscriber price set forth in the Term Sheet.

(Joint Appendix, p. A-0503-96-A-0503-97).

Again, although it was retained to represent the Debtors solely in the Juno Action, and not in the broader reorganization proceedings, the Debtors turned to Riker to file both objections to the Committee's Disclosure Statement and Plan. Plainly going beyond the scope of its limited retention, Riker presented a series of different "best case" theories under which the estate might recover from $21,000,000 to perhaps as much as $54,000,000 if the Debtors were successful in litigating the Juno Action.

On December 21, 2006, the Bankruptcy Court held a very lengthy and highly contested Plan confirmation hearing focusing primarily on the merits of the Juno Settlement (and as a corollary, the strength of Riker's damage theories) and whether the settlement was in the best interests of the Debtors' estates and creditors (a transcript of the confirmation hearing is annexed as Item 20 of the Joint Appendix, p. A-1129). Riker represented the Debtors at the confirmation hearing and vigorously opposed the Juno Settlement. After hearing the evidence and considering

21

that creditors had voted to accept the Plan, the Court approved the Juno Settlement and confirmed the Plan over Riker's objections.

After the Plan was confirmed and the confirmation order became final -- no party appealed from the order-- Riker filed its fee application (Joint Appendix, Item 22). In the Application, Riker claimed it was entitled to a fee of over $2.4 million from the proceeds of the Juno Settlement. This claim was grounded exclusively on the terms of the Rothschild Letter Riker had prepared and sent to the Debtors (Joint Appendix, Item 22) and without regard to the facts that: (i) Riker had played no part in securing the settlement; (ii) Riker had not demonstrated, as required by the Debtors' application in support of its retention, that it was successful in its efforts; and (iii) the monies from which Riker sought to be paid were the same monies Riker sought to keep from the estates when it opposed the Juno Settlement and confirmation of the Plan.

Notwithstanding that Riker's steadfast and continued opposition to the Juno Settlement and its complete lack of success should have if not disqualified it from receiving a fee, caused it to receive a substantially reduced fee, the Bankruptcy Court awarded Riker payment for every minute of time spent by billing professionals at the firm at their full hourly rate, including time spent representing the Debtors in matters beyond the scope of its retention. It also meant that Riker secured the highest fee award of any professional retained in the case, including counsel to the Committee. Nevertheless, Riker filed its appeal, complaining it was unfairly treated because it did not receive a fee equal to twice its puzzlingly high hourly charges.

As set forth below, the Committee believes that certain aspects of the Bankruptcy Court's ruling upon the Riker Fee Application were correct and others were not. Although the Court did reduce the amount of the Riker fee request to the Fee Award, the Committee believes that the

Riker fee request should have been substantially lower than $1.2 million, if not zero. The Committee also believes that the fee application filed by Riker should not have been reviewed under the standards of section 328(a) of the Bankruptcy Code but, rather, solely on the basis of sections 330 and 331, in which the Court would apply a reasonableness factor to determine the award of Riker's fees. Nevertheless, the Committee believes that if section 328(a) were to apply, the Bankruptcy Court correctly determined that the terms of Riker's retention under that section proved improvident, but erred in failing to fully consider the requirement that a fee to Riker required that the firm be successful in the Juno Action.

## ARGUMENT

## POINT I

## THE RETENTION ORDER WAS NOT AN UNCONDITIONAL PRE-APPROVAL ORDER AUTHORIZING RIKER'S RETENTION

At the core of Riker's claim that it was entitled to $2.4 million in fees and expenses is its contention that its retention was "pre-approved" by the Bankruptcy Court pursuant to section 328(a) of the Bankruptcy Code. It claims that the Bankruptcy Court was powerless to do anything other than rubber stamp the amount it sought, unless its retention can be shown to have been improvident in light of developments not capable of being anticipated at the time of the retention. The Bankruptcy Court agreed that Riker's retention was in fact a pre-approved order of retention pursuant to section 328(a) of the Bankruptcy Code, although it also found based on the record before it, and its general familiarity with the bankruptcy proceedings as a whole, that Riker's retention was improvident (See Point II, *infra*). In its Appellate Brief, Riker argues that the ruling by the Bankruptcy Court that its retention was governed by section 328(a) was proper because when the Debtors sought to retain Riker, they "specifically presented a contingency fee arrangement." See Riker Appellate Brief, p. 37.

The Committee submits that the Bankruptcy Court erred when it determined that section 328(a) applied to Riker's fee application. When the language of Riker's Retention Order is considered in light of both the relevant case law and the facts and circumstances of this case, it is clear that the Retention Order was not of a kind or character which would insulate a review of Riker's fees under section 330 of the Bankruptcy Code, applicable to the other professionals in this case.

Section 328(a) of the Bankruptcy Code has been described as a "pre-approval" statute whereby a professional may under limited circumstances ask the Court to approve the terms of its retention at the outset of performance, with only limited ability to award fees other than as provided in the retention. See, e.g., Benassi v. First Nat'l Bank of Babbit (In re Benassi), 72 B.R. 42 (D. Minn. 1987); see also Nischwitz v. Miskovic (In re Airspect Air, Inc.), 385 F.3d 915 (6th Cir. 2004) [hereinafter "Airspect"]. However, the cases hold that, given the extraordinary privilege conferred by the statute, a retention must clearly and unambiguously demonstrate it is under section 328(a). If there is any doubt, the Court should "default" to the general provisions provided in section 330 of the Bankruptcy Code.

At least four Courts of Appeal have addressed this issue and all, in one form or another, have held that if there is any doubt as to the nature of the retention, section 328(a) does not apply. In Airspect, for example, the Sixth Circuit reversed a decision of the Bankruptcy Appellate Panel which held that the Bankruptcy Court had pre-approved a contingency fee arrangement pursuant to section 328 and was therefore "obligated to honor the agreement unless intervening circumstances had rendered the agreement 'improvident.'" Airspect, 385 F.3d at 917. In Airspect, the debtor had employed an attorney, appellant Nischwitz, as special counsel to litigate a breach of contract claim pursuant to a contingent fee agreement, but the retention

24

order specifically required Nischwitz to submit an application for payment of fees to the Court for approval. <u>Airspect</u>, 385 F.3d at 918.

After reviewing decisions of the Third and Ninth Circuits concerning the appropriate standard for determining whether a retention was in fact a section 328(a) retention, the Sixth Circuit concluded that "whether a court 'pre-approves' a fee arrangement under § 328 should be judged by the totality of the circumstances, looking at both the application and the bankruptcy court's order. Factors in the determination may include whether the debtor's motion for appointment specifically requested the pre-approval, whether the court's order assessed the reasonableness of the fee, and whether either the order or the motion expressly invoked § 328." <u>Airspect</u>, 385 F.3d at 922.

In <u>Airspect</u>, the Sixth Circuit observed that a finding of pre-approval based on anything less than an affirmative authorization by the bankruptcy court would "be too lax," <u>Airspect</u>, 385 F.3d at 921, and that such an authorization should not be inferred from the "simple mention of a fee agreement in the debtor's motion for appointment." This, the Court cautioned, "would undermine the statutory scheme." <u>Id</u>. Citing to, among other facts, that the order of retention did not mention section 328, that neither the order nor the application discussed the reasonableness of the fee, and that Nischwitz was required to submit fee applications to the Court, the Court held "under the totality of the circumstances, the bankruptcy court could never 'pre-approved' [sic] the contingency arrangement under § 328." <u>Airspect</u>, 385 F.3d at 922.

In <u>Friedman Enterprises v. B.U.M. International, Inc. (In re B.U.M. International, Inc.)</u>, 229 F.3d 824 (9th Cir. 2000), albeit employing a different standard, the Ninth Circuit reached much the same conclusion, <u>i.e.</u> retentions under section 328(a) must be free from doubt, and if in doubt, the retention defaults to section 330. In its decision the Ninth Circuit affirmed the district

25

court, which in turn had affirmed a bankruptcy court decision denying the appellant's request for certain contingency fees under a contingent fee arrangement executed with the debtor. Because the bankruptcy court specifically reserved the right to approve all fees and costs of the appellant when it approved the retention, the Court characterized the retention as only conditionally approved under section 328. "We conclude on this record that while the bankruptcy court may have *conditionally* approved FE's employment, it did not convey its complete approval under § 328. To the contrary, it specifically reserved the right to approve the fees. Even if the bankruptcy judge thought that such a reservation was unnecessary to keep the door open for court approval of the fees and costs, he nevertheless specifically and in writing put all interested parties on notice that all of FE's fees were subject to court approval down the road." Friedman Enterprises, 229 F.3d at 829 (emphasis in original). Thus, in the Ninth Circuit, if the retention under section 328(a) is "conditional" the court retains the right to review the fees under the traditional standards incorporated in section 330.

In Zolfo, Cooper & Co. v. Sunbeam-Oster Company, Inc., 50 F.3d 253 (3rd Cir. 1995), the Third Circuit adopted the reasoning of the bankruptcy court in In re C&P Auto Transport, Inc., 94 B.R. 682 (Bankr. E.D. Cal. 1988). In the Zolfo case, the bankruptcy court emphasized the importance of precise language in the order approving a professional retention. "If the order does not expressly and unambiguously state specific terms and conditions ... that are being approved pursuant to the first sentence of section 328(a), then the terms and conditions are merely those that apply in the absence of specific agreement. That leaves the court free to apply lodestar rights unfettered by the strictures of the second sentence of section 328(a) ...." Zolfo, Cooper, 50 F.3d at 261.

26

The Third Circuit noted that this comment established a "useful and appropriate presumption" that prevents courts from being unintentionally bound to specific terms. The Court cautioned that it is the responsibility of the professional to ensure in its <u>order</u> that the court expressly state the terms and condition if the professional expects them to be established at that early point. It cautioned that the bankruptcy court's duty to conduct an independent examination of fee applications for services rendered would be "unduly restricted if employment authorization orders were routinely construed as binding the court to particular terms of employment." <u>Zolfo, Cooper</u>, 50 F.3d at 262.

Indeed, the Seventh Circuit, in <u>In the Matter of Lytton's</u>, 832 F.2d 395 (7th Cir. 1987), seems to have established a rule that would permit a bankruptcy court to review any application for fees, even if it was first made pursuant to section 328(a) of the Bankruptcy Code. In <u>Lytton's</u>, although the issue before the Court was clouded by a question of finality and appealability,[5] the Court nevertheless stated that

> [s]ection 328, however, explicitly allows the employment of an attorney on a contingent fee basis. In addition, that provision does not prohibit setting a contingent fee schedule, nor does it state that setting a contingent fee schedule, or any rate of compensation, will exempt the fee-seeker from the usual bankruptcy code procedures of notice to creditors and a hearing before the bankruptcy court approves the fees. Indeed, we believe that section 328 read in conjunction with section 330 contemplates that an attorney seeking a contingent fee payment must still apply to the bankruptcy court and that the language of section 328 expressly allows setting a rate of payment at the beginning of an attorney's employment that may later be changed.

<u>Lytton's</u>, 832 F.2d at 400.

---

[5] The appeal in that case was from the order retaining the professional and not from a fee award.

In the absence of controlling Second Circuit precedent, both the Bankruptcy Court and this Court are obviously free to follow any of the precedents established by either the Third, Sixth, Seventh or Ninth Circuits, or to use some other test for determining whether the retention order was a pure section 328 retention. However, under any standard, the Committee submits the result should be the same – that is, that the Retention Order was not a "pre-approved" order, and the Riker Fee Application was therefore subject to the Court's review under sections 330 and 331 of the Bankruptcy Code. In the first instance, the Retention Order makes no reference to section 328(a). The order says that any and all compensation to be paid to the Riker firm "for services rendered on behalf of the Debtors in the within chapter 11 proceeding shall be fixed upon further application of this court ...." The UST objected to Riker's retention on a contingency basis and raised this precise issue, as well as reserving its rights to object to the fees on reasonableness and other grounds as permitted by section 330. In short, it is clear that the Bankruptcy Court intended to retain authority over any fee application Riker might submit and equally intended to retain the authority to "fix" the firm's fees.

These are the exact same facts under which the Sixth Circuit in <u>Airspect</u> determined that the retention order was not a pre-approved contingency arrangement – as in <u>Airspect</u>, the order did not mention section 328 nor did it discuss the reasonableness of the fees and Riker was required to submit a fee application to the Court. Additionally, as in <u>Freidman Enterprises</u>, the Bankruptcy Court specifically reserved the right to approve Riker's fees. Finally, as in <u>Zolfo, Cooper</u>, Riker's Retention Order did not expressly and unambiguously state the specific terms being approved. The applicable case law therefore clearly establishes that Riker's Retention Order was not a "pre-approved" order, and Riker's fees should therefore have been determined

by the Bankruptcy Court under sections 330 and 331 of the Bankruptcy Code, free from any restriction.

Accordingly, to the extent that the Fee Award to Riker was based on the application of section 328(a) as opposed to sections 330 and 331 of the Bankruptcy Code, it was in error.

## POINT II

### EVEN IF SECTION 328(a) WERE APPLICABLE, THE TERMS AND CONDITIONS OF RIKER'S EMPLOYMENT HAVE PROVEN TO BE IMPROVIDENT IN LIGHT OF DEVELOPMENTS NOT CAPABLE OF BEING ANTICIPATED AT THE TIME OF THE FIXING OF THE TERMS OF ITS EMPLOYMENT

Although the Committee believes that section 328(a) is inapplicable in determining Riker's fee request, the Committee believes if that section applies here, the Bankruptcy Court correctly found that the terms and conditions of Riker's employment ultimately proved improvident and that these findings are not clearly erroneous.

Section 328(a) of the Bankruptcy Code permits a bankruptcy court to re-examine a contingency fee arrangement in light of subsequent events, if it finds, based on the record of the entire case it administered, that these subsequent events were not reasonably capable of being anticipated at the time the agreement was approved.  11 U.S.C. § 328(a).

In re XO Communications, Inc., 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005), Judge Gonzalez wrote "[u]nder section 328(a), a court may not revisit its prior determination as to the reasonableness of an agreement previously approved unless it determines that the terms and conditions prove to be improvident at the time they were approved in light of the then - unforeseen circumstances."  At least one other court has ruled that the phrase is subject to broad interpretation and that under section 328(a) "the bankruptcy court has substantial discretion in altering fee agreements when the circumstances warrant."  In re Confections By Sandra, Inc., 83 B.R. 729, 733 (9th Cir. BAP 1987).

29

Indeed, courts have found that in dealing with contingency fees, it may disregard the terms of retention agreements. In In re Financial News Network, Inc., 134 B.R. 732 (Bankr. S.D.N.Y. 1991), the court stated that "[s]ection 328 gives the court broad discretion to allow or disallow counsel fees notwithstanding the terms and condition of the employment agreement. In fact, a Bankruptcy Court may totally disregard an employment agreement where necessary and award compensation more appropriate under the individual circumstances of the case." Financial News Network, 134 B.R. at 735, citing In re Port Royal Land & Timber Co., 105 B.R. 72 (Bankr. S.D. Ala. 1989). Similarly, in In re Omegas Group, Inc., 195 B.R. 875, 880 (Bankr. W.D. Ky. 1996) the court found that "[a]ccordingly, the bankruptcy court is expressly empowered to 'totally disregard an employment agreement where necessary and award compensation more appropriate under the individual circumstances of the case.'"

Additionally, at least one court has determine that where an order appointing counsel on a contingency basis required counsel to file a fee application, the court was permitted to review counsel's fees to determine whether a contingency fee award was unconscionable. Thus, in In re Chiapetta, 159 B.R. 152 (Bankr. E.D. Pa. 1993), the court stated that the requirement for filing a fee application notwithstanding the contingency basis of retention is imposed

> to permit this court to determine what services were performed as one element in determining the appropriate allowable fee.... Our practice in entering Orders like that in this case... serves several purposes. First, it eliminates the court's inability to alter contingency-fee agreement proven to be unconscionable without having to establish that the contingency-rate was initially "improvidently granted."... We believe that such an Order gives us the full right and duty to determine whether a contingency fee award is unconscionable. Second, it put the professional appointed on notice of the necessity to keep and retain time records to be subject to this court's potential adjustment of the contractual contingent-fee rate in making its award.

Chiapetta, 159 B.R. at 157-8.  Here, as in Chiapetta, Riker's Retention Order required it to file a fee application and the court can, therefore, reduce Riker's fees on an "unconscionable" basis.

Thus, case law makes clear that notwithstanding a section 328 retention, the court may revisit the original terms of retention on several grounds, including if such terms of employment prove to be improvident in light intervening circumstances.  Importantly, the Bankruptcy Appellate Panel in the lower court decision in Airspect held that "[u]nder § 328, an intervening circumstance… must be one that would have affected the court's decision in the first place.  It must have been relevant to that decision in some way, rendering it untenable or unwise in hindsight."  In re Airspect Air, Inc., 288 B.R. 464, 471 (6th Cir. BAP 2003), rev'd on other grds, 385 F.3d 915 (6th Cir. 2004) (emphasis supplied).  As discussed below, there are several intervening circumstances which the Committee believes clearly would have affected the Bankruptcy Court's decision to approve the retention of Riker on a contingent basis and that rendered that decision untenable and unwise.

Based on the record, the Bankruptcy Court held that it was in fact able to allow different compensation to Riker than under the contingency arrangement, given that the terms and conditions of Riker's employment proved to be improvident in light of the following developments not capable of being anticipated at the time of Riker's retention:

> One, the divergent positions regarding litigation and settlement
> strategy that developed between the Debtor and Committee and the
> resulting extreme antagonism, animosity and demonstrable lack of
> cooperation that existed among interested parties in the bankruptcy
> case. Two, the fact that Riker Danzig as special litigation counsel
> for the Debtor took instructions directly from the [Daums] who
> seemed to be motivated principally by their desire to benefit equity
> rather than the Creditors to whom the Debtors owed a fiduciary
> duty. Three, the unusually prolonged procedural path of this
> litigation caused in substantial part by the actions of Riker Danzig
> at the direction of  the [Daums]. And four, the fact that Riker
> Danzig, again acting at its clients' direction, was an obstacle, not

31

an asset, when it came to approval of the settlement, which
settlement was ultimately approved by this Court as part of the
confirmed plan of organization, and Riker Danzig worked
aggressively, albeit unsuccessfully, to block the efforts of the
committee to settled that litigation.

See, Transcript of Decision upon Riker's Fee Application, Item 28 of Joint Appendix, p.14, l. 22-

p. 15, l. 16.

Although Riker, in its Appellate Brief, maintains that there is no factual predicate for the

Bankruptcy Court's finding that these events were incapable of being anticipated at the time of

its retention, the Committee submits that numerous circumstances, unforeseen at the time of the

retention, did require an adjustment to the fees requested by Riker.  First and foremost, Riker

argues that it was foreseeable that it would pursue the appeal of the Original Settlement to the

Second Circuit.  Although Riker cites several cases holding that appeals are not unforeseeable,

none remotely relate to section 328(a) of the Bankruptcy Code.  As demonstrated by the record

of the hearing at the time of Riker's retention, creditors reasonably anticipated a fairly quick

settlement with Juno.  They also believed that they would be negotiating the settlement and once

reached, they could be its proponent.  The Debtors and Riker both knew this.  No one could have

reasonably anticipated that the Debtors in these demonstrably insolvent cases would have

persisted in violating their fiduciary responsibilities to creditors by opposing all attempts to settle

with Juno, or that the Second Circuit would subsequently rule that the Committee had no

standing to settle the adversary proceeding brought by Juno.  Certainly, the Committee would not

have agreed to a contingency arrangement had it anticipated that at the time of the retention, it

could not propose a settlement without the Debtors' agreement; or put another way, it was not

reasonably anticipated that approximately four years after Riker was retained, the Second Circuit

would hold that the Debtors had veto power over any settlement the Committee reached with

Juno.

The Committee and other creditors would not have knowingly agreed to the Riker fee arrangement had they known they had no ability to influence events and were actually powerless to settle with Juno. Indeed, the Committee would never have negotiated a fee arrangement which gave Riker a larger percentage of the recovery the longer the litigation lasted if it anticipated that it had no ability to end the litigation. The Committee further submits that if the Bankruptcy Court had believed that Riker and the Debtors had the discretion and power to block a settlement of the Juno Action, the Bankruptcy Court's decision to authorize the retention of Riker upon the terms presented to it would certainly have been affected. The unanticipated subsequent events rendered the Court's original retention decision untenable, unwise, and improvident under section 328(a) of the Bankruptcy Court.

Riker also argues that it properly conducted the litigation of the Juno Action and that the overly litigious nature of the Juno Action – which it blames on Juno – was likewise foreseeable. The cases cited to support this "forseeability of litigation" have nothing to do with section 328(a) of the Bankruptcy Code. Riker also contends that in conducting the Juno Action, it followed the direction of the Debtors' principals, a fact obviously capable of being anticipated. The facts of this case, of which the Bankruptcy Court was intimately familiar, amply support the notion that the extremes gone to by the Debtors through Riker were not reasonably anticipated. At the time of Riker's retention, the Committee could not have anticipated that Riker would embark on a six year course to pursue counterclaims with no merit. Incredibly, the Debtors, through Riker, continued on this path well after discovery demonstrated the counterclaims lacked merit. Such actions, respectfully, could not have been foreseen at the time Riker was retained given that Riker knew the Committee was in active settlement negotiations with Juno and was of a mindset to finish those discussions quickly.

33

Finally, Riker argues that by reducing its fees, the Bankruptcy Court undermined Congressional policy that professionals in bankruptcy cases should be incentivized to practice in bankruptcy courts, especially where payment "involve[s] a high risk". See Appellate Brief, p. 34. Again, Riker's arguments are misplaced. Juno's acknowledgement in its complaint of its obligation to pay for Qualified Subscribers in accordance with the Term Sheet materially reduced, if not eradicated, the level of risk to Riker.

In short, there were more than sufficient reasons for the Bankruptcy Court to conclude that subsequent facts and circumstances could not have reasonably been anticipated at the time of Riker's retention and that the terms of the retention proved improvident. Thus, the Bankruptcy Court was correct in reducing the award from $2.4 million.

**POINT III**

**IRRESPECTIVE OF WHETHER THE COURT APPLIES SECTION 328(a) OR SECTIONS 330 AND 331 OF THE BANKRUPTCY CODE TO DETERMINE RIKER'S FEE APPLICATION, THE FEE AWARD TO RIKER IS EXCESSIVE AND MUST BE SIGNIFICANTLY REDUCED**

Regardless of whether Riker's fee application was approved under section 328(a) of the Bankruptcy Code or sections 330 or 331 of the Bankruptcy Code, it was excessive and should be significantly reduced. Riker claimed entitlement to fees and expenses based upon the Rothschild Letter it alleges was "incorporated" into its Retention Order (Joint Appendix, p. A-1406). Putting aside the fact that the letter was never "incorporated" into the order, the Retention Order made it clear that Riker's fees were to be fixed "in accordance with" not only the Rothschild Letter, but with the Debtors' application as well. The application, however, expressly provided that Riker would not be entitled to any fees unless it was successful and represented that Riker had agreed to this arrangement. At the hearing on Riker's retention, the Bankruptcy Court stated

34

repeatedly that unless Riker brought a recovery into the estate, it would not earn a fee. Riker, the Court confirmed, had to be successful.

Thus, if section 328(a) of the Bankruptcy Code is the applicable statute under which Riker's fee request is to be considered, Riker should not have been awarded any fees unless it demonstrated that its successes were the cause of the recovery from Juno. All of the money in the estate, however, came as a result of a settlement engineered solely by the Committee. As the Bankruptcy Court found, Riker's role in the settlement was to oppose it before and after it was reached and even after creditors voted to accept a plan, based upon full disclosure, of which the settlement was central. In its Appellate Brief, Riker makes much of the fact that the Juno Settlement was $1 million higher than the Original Settlement and takes credit for that increase. What Riker fails to acknowledge is that the $1 million increase in the settlement is largely, if not wholly, due to accrued interest between the time of the Original Settlement and the time of the Juno Settlement, and had no absolutely nothing to do with Riker's successful appeal to the Second Circuit. Indeed, given the time value of money, and the enormous amount of expenses that were required to be incurred by the estates because of Riker's six year endeavor at the behest of the Debtors and their principals, it is likely that the creditors would have received a greater distribution from the Original Settlement than from the Juno Settlement ultimately approved by the Court. As a result, the increased settlement amount is not attributable to any success by Riker in the Juno Action.

This would not be the first case in which a percentage or contingency fee is reduced or denied based on a "success factor." In In re Begun, 162 B.R. 168 (Bankr. N.D. Ill. 1993), a previously approved 5% commission to a broker was found to be improvident and was therefore reduced, the court finding that the amount of time and expense put into the project by the broker

35

did not warrant the full amount requested. The court stated that while the initial stalking horse was in part due to the broker's efforts, "the broker's efforts did not produce the successful bidder and the higher sales price was obtained as a result of the competitive biding process." Begun, 162 B.R. at 180.[6]

Similarly, in In re Schubert, 143 B.R. 337 (S.D.N.Y. 1992), a real estate broker was retained in a bankruptcy case and was to be paid a commission of 6% if it "finds a purchaser of the premises." The broker found a stalking horse, but another broker found a different bidder who ultimately purchased the property. The Bankruptcy Court reduced the original broker's commission by 6% of the difference in the amount between what the broker's customer/purchaser was going to pay and what the successful purchaser paid. The District Court found that the Bankruptcy Court had authority to reduce the original broker's commission finding that the original broker played a minimal, if any, role in the successful purchaser's acquisition of the townhouse; the original broker's minimal role was a development not capable of being anticipated when the court issued the retention order; and that the terms of the retention order were improvident in light of the original broker's limited role. In re Schubert, supra.

The Bankruptcy Court committed error by not properly considering whether Riker was "successful" before it awarded Riker its fee. The Committee submits that Riker was wholly unsuccessful in its efforts; or if it was successful, a $1.2 million fee grossly overstated the degree of Riker's success. Since it is certainly evident that Riker was required to be successful in the Juno Action in order to recover any fees for its services, and it since it is equally evident that

---

[6] While Begun in large part dealt with a non-disclosure issue, the court specifically cited to the fact that the broker's efforts did not produce the successful bidder as a reason for the reduction of its fees.

Riker was unsuccessful in its efforts (the only success coming from the Committee's resolution of the Juno Action), the Bankruptcy Court committed reversible error in failing to take into account the success requirement.

Not only did the Bankruptcy Court ignore the success requirement in awarding the Fee Award, but in its Appellate Brief, Riker likewise ignored this issue. The only tangential reference by Riker is on page 39 where, without any support whatsoever, it incorrectly states that the Bankruptcy Court authorized Riker's retention with the knowledge that Riker "would be paid for any 'recoveries from Juno' whether or not they resulted from a settlement brokered by the Committee or from a full and final litigation to judgment." Such a statement is blatantly incorrect given both the Debtors' application for retention which expressly provided that Riker would not be entitled to any fees unless <u>Riker</u> (not the Committee) was successful in obtaining a result for the estates, and the Bankruptcy Court's statement at the hearing upon the Riker retention application making clear that <u>Riker</u> (not the Committee) must have been successful to be paid.

The same holds true if Riker's fee request is reviewed under sections 330 and 331 of the Bankruptcy Code. In considering the reasonableness of Riker's fee request, it would be incumbent upon the Court to consider Riker's lack of success as addressed above, as well as the role played by Riker in continually delaying recovery by the creditors and the resultant expense caused by Riker to the estates.

Indeed, neither the Debtors nor Riker appears to have ever seriously considered approaching Juno with any kind of settlement. Instead, Riker seized the torch and was off on a six year litigation quest, asserting counterclaims of doubtful value, opposing any efforts by the creditors to settle with Juno despite their knowledge at the time of their retention that the

37

Committee intended on negotiating a settlement with Juno and rejecting an earlier mediated settlement entered into by the Committee with Juno and WorldCom in 2003. So by whatever measurement the Court applies to Riker's efforts, it cannot be said that the firm was successful in its efforts. Without any success, Riker has no basis to claim entitlement to any recovery, let alone 37% of these estates.

Finally, in addition to failing to take the success requirement into account, the Bankruptcy Court also erred in setting the Fee Award at the alleged amount of Riker's actual time expended in connection with the Juno Action (commonly referred to as the "lodestar "). Although at the hearing upon Riker's retention the bankruptcy judge clearly stated that Riker would be required to file a fee application including its time records (Joint Appendix, p. A-0068), Riker did not file any time records with its Fee Application, and it was only after the insistence of Committee's counsel that Riker finally turned over same. Despite Riker's failure to timely file its time records with its fee application, the Bankruptcy Court implicitly determined that the Fee Award represented an appropriate lodestar amount. The Committee submits, however, that Riker's time records include numerous instances of time entries which have nothing to do with the Juno Action and go beyond the scope of Riker's retention, and that the services rendered by Riker as detailed in the time records were extremely excessive in relation to the services provided. At a minimum, therefore, if this Court determines that the lodestar is the appropriate amount of a fee award to Riker, the case should be remanded to the Bankruptcy Court so that the Committee, the UST and the Court can analyze the amounts alleged by Riker to constitute the lodestar and reduce same as is deemed necessary as a result of such analysis and argument.

Accordingly, the Committee respectfully submits that the Bankruptcy Court erred in fixing the Fee Award at approximately $1.2 million, the Fee Award must be significantly reduced from that which was granted by the Bankruptcy Court, or at a minimum, the matter should be remanded to the Bankruptcy Court for further analysis.

## CONCLUSION

As detailed above, certain aspects of the Bankruptcy Court's ruling on Riker's Fee Application were correct, while others were not. Contrary to the Bankruptcy Court's ruling, applicable case law, when applied to the facts and circumstances of this case, demonstrates that Riker's Retention Order was not an unconditional pre-approved order authorizing Riker's retention. Rather, Riker's Fee Application should have been determined on the basis of sections 330 and 331 of the Bankruptcy Code. However, even if section 328(a) were applicable, the terms and conditions of Riker's employment were improvident in light of events incapable of being anticipated at the time of its retention, a matter correctly decided by the Bankruptcy Court.

Finally, irrespective of whether the Court applies section 328(a) or sections 330 and 331 of the Bankruptcy Code to determine Riker's Fee Application, the Fee Award to Riker must be significantly reduced since Riker was required by the terms of its employment to be successful in connection with the Juno Action, which it clearly was not. Given this, the Committee believes that the Bankruptcy Court erred in ignoring the success requirement imposed by Riker's retention and awarding Riker far more than it was otherwise entitled to. Accordingly, the Committee believes that while the Appealed Order should be reversed, the reversal should be in

39

the form of a significant reduction in the Fee Award granted to Riker, and not, as Riker

improperly suggests, awarding Riker the $2.4 million fee request made by it in this case.

Dated: New York, New York
      June 18, 2007

Respectfully Submitted,

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Special Bankruptcy Council for the Official
Committee of Unsecured Creditors.


By: __/s/   Laurence May_____
      Laurence May, Esq. (LM-9714)
      Bonnie L. Pollack, Esq. (BP-3711)
900 Third Avenue
New York, NY 10022
(212) 752-8000

40

**<u>APPENDIX</u>**

**§ 328. Limitation on compensation of professional persons**

    (a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

**§ 158. Appeals**

(a) The district courts of the United States shall have jurisdiction to hear appeals

(1) from final judgments, orders, and decrees;

(2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

(3) with leave of the court, from other interlocutory orders and decrees;

and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

**Rule 52 F.R.Civ.P.**

**FINDINGS BY THE COURT; JUDGMENT ON PARTIAL FINDINGS**

(a) **Effect.** In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. It will be sufficient if the findings of fact and conclusions of law are stated orally and reported in open court following the close of the evidence or appear in an opinion or memorandum of decision filed by the court. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in subdivision (c) of this rule.