UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

IN RE:

SMART WORLD TECHNOLOGIES, LLC,
FREEWWWEB, LLC, and SMART WORLD
COMMUNICATIONS, INC.,

                 Debtors.

----------------------------------X

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI LLP,

                Appellant,        <u>OPINION</u>

      -against-               07 Civ. 3603 (MGC)

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

                Appellee /
                Cross-Appellant.

----------------------------------X

APPEARANCES:

       RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
       Appellant <u>pro se</u>
       <u>500 Fifth Avenue</u>
       New York, New York 10110

       By:  J. Alex Kress, Esq.
            Glenn D. Curving, Esq.
            Seth H. Lieberman, Esq.

       COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, PA
       Attorneys for Appellee/Cross-Appellant
       900 Third Avenue
       New York, New York 10022

       By:  Laurence May, Esq.
            Bonnie L. Pollack, Esq.

**Cedarbaum, J.**

Riker, Danzig, Scherer, Hyland & Perretti LLP ("Riker Danzig") appeals from an order of the United States Bankruptcy Court, James M. Peck, <u>B.J.</u>, reducing its fee award for acting as special litigation counsel to Smart World Technologies, LLC, Freewwweb, LLC, and Smart World Communications, Inc. (collectively "Smart World").  The Official Committee of Unsecured Creditors (the "Committee") cross-appeals, arguing principally that Riker Danzig's fee should be further reduced. For the following reasons, the order of the bankruptcy court reducing Riker Danzig's fee award is reversed, and the case is remanded for entry of a fee award in the amount of $2,142,006.27, plus expenses of $73,981.18.

### BACKGROUND

From 1996 to 2000, Smart World was a provider of free internet service.  Unable to make a profit, Smart World agreed to sell its most valuable asset, its subscriber list, to Juno Online Services, Inc. ("Juno").  Juno required Smart World to file for bankruptcy as part of the transaction, and the bankruptcy court, Cornelius Blackshear, <u>B.J.</u>, approved the sale.  The deal quickly ran into trouble.  Smart World asked the bankruptcy court for a good faith hearing.  Smart World alleged that Juno, in an attempt

to pay less for the subscriber list, had obscured the true number of subscribers who had switched from Smart World to Juno.  Juno denied the allegation and sued Smart World for, among other things, concocting false claims in an "'effort to extract additional consideration from Juno ... and to obtain other modifications'" to the deal.  Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 170 (2d Cir. 2005) (quoting Juno's complaint).

On November 7, 2000, Smart World applied to the bankruptcy court for an order approving the retention of Riker Danzig as special litigation counsel "pursuant to 11 U.S.C. §§ 327 and 328," the sections of the Bankruptcy Code regarding pre-approved compensation for debtors' counsel.  (Application of Debtors-in-Possession for an Order Approving Retention of Special Litigation Counsel, November 7, 2000, at ¶ 7.)  On November 16, 2000, the bankruptcy court issued an order authorizing Smart World's retention of Riker Danzig.  The order provided that compensation would be in accordance with "the letter of James S. Rothschild, Jr., Esq., dated November 15, 2000, and annexed hereto and made a part hereof."

The annexed letter, from Riker Danzig to debtors' counsel (the "Rothschild Letter"), provided for a contingency fee for Riker Danzig's litigation services:

> 1) Riker Danzig will be paid all expenses off of the
> top [of] any recovery and, after payment of expenses,
> will receive 33-1/3% of the first $1,500,000 obtained
> from Juno; 2) Riker Danzig's share of funds in excess
> of $1,500,000 but less than $8 Million will be (a) 0%
> if the litigation lasts less than 6 months, (b) 10% if
> the litigation lasts from 6 months to 9 months, (c) 20%
> if the litigation lasts between 9 months and 12 months,
> (d) 37% if the litigation lasts more than 12 months;
> and 3) Riker Danzig will receive 37% of all funds
> received in excess of $8 Million.  Finally, Riker
> Danzig's fee for any monies received after 18 months
> shall be 33 1/3%.

(Rothschild Letter at 1-2.)

According to debtors' counsel, the agreement was structured
so that "[a]fter eighteen months, thirty-seven percent becomes
thirty-three percent ... for the entire amount over $1.5
million," creating an "incentive for [Riker Danzig] ... to settle
this within the first 18 months."  (Transcript of the November
14, 2000 hearing ("November 2000 Hearing") at 20-21.)

Litigation proceeded until early 2001, when Juno's lawyers
told Riker Danzig that a settlement had been reached between
Smart World's creditors and Juno.  At a February hearing, the
bankruptcy court determined that a settlement had not been
reached.  However, the court believed that the parties were close
to settling, and accordingly granted Juno's request to stay the
adversary litigation.  Over the next two years, the bankruptcy
court denied Smart World's motions to recommence litigation,
despite the fact that no settlement had been reached.  "The
bankruptcy court also paid scant attention to evidence suggesting

4

that WorldCom [a creditor] might have been pursuing a quick and easy settlement with Juno, under which it would receive the bulk of the settlement payment, for reasons antithetical to interests of the estate." Smart World, 423 F.3d at 172.  In October of 2002, the bankruptcy court ordered the adversary proceeding into mediation, in which Riker Danzig participated.

In May of 2003, Juno and the creditors of Smart World filed a motion to settle the adversary proceeding, under a settlement plan in which Juno paid $5.5 million to creditors.[1]  Smart World objected on several grounds, including (1) that Smart World, absent meaningful discovery, had not been able to value the likely success of its claims against Juno; and (2) that the creditors lacked standing to pursue settlement of the adversary proceeding over the debtors' objections.  Smart World, 423 F.3d at 172.  The bankruptcy court dismissed Smart World's objections and approved the settlement, which was affirmed by the district court.  Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), No. 03 Civ. 9467, 2004 WL 1118328 (S.D.N.Y. May 19, 2004).  Riker Danzig appealed, and, in September of 2005, the Second Circuit vacated the approval of the settlement.  The Second Circuit held that Smart World's creditors did not have standing to settle the adversary proceeding with

---

[1]    The agreement was to pay $5.5 million to WorldCom, a
       creditor, which in turn would pay $1.8 million to the
       Committee.  Smart World, 423 F.3d at 172 n.9.

Juno over the objections of the debtor-in-possession.  Smart
World, 423 F.3d at 184.

On remand, the bankruptcy court set a discovery schedule,
and discovery proceeded.  When Smart World's exclusive period to
file a plan of reorganization ended, the Committee, which now had
standing as a plan proponent, filed a Plan of Liquidation.  The
plan included a $6.5 million settlement between the creditors and
Juno.  Riker Danzig objected to the proposed settlement of the
adversary proceeding, arguing that the subscriber list contained
as many as 850,000 names, not 132,000 as Juno maintained, and
that the settlement therefore undervalued Smart World's claim
against Juno for payment for the subscriber list.

The bankruptcy court, James Peck, B.J., dismissed as "rank
speculation" Riker Danzig's belief that it would gain a better
settlement by going to trial.  (Transcript of December 21, 2006
confirmation hearing at 213.)  The court confirmed the plan,
finding that the proposed $6.5 million settlement "d[id] not fall
below the lowest point in the range of reasonableness....  It may
be right at that level, but it is not below it."  Id. at 217.

Riker Danzig applied for a fee award of $2,320,959.02, plus
expenses.  At the second of two hearings on the fee award, the
bankruptcy court read into the record its opinion reducing Riker
Danzig's fee.  The fee was reduced pursuant to 11 U.S.C. §
328(a), which allows a court to change a pre-approved fee only

when the terms and conditions of the fee agreement "prove to have
been improvident in light of developments not capable of being
anticipated at the time of the fixing of such terms and
conditions."  The court found that the contingency fee
arrangement was improvident for four reasons:  (1) "the divergent
positions regarding litigation and settlement strategy that
developed between the Debtor and the Committee and the resulting
extreme antagonism, animosity and demonstrable lack of
cooperation" between the parties; (2) "the fact that Riker Danzig
as special litigation counsel took instructions directly from the
[Daums]," meaning Steven and Pamela Daum, officers and majority
shareholders of Smart World, i.e., the debtors-in-possession,
"who seemed to be [inner]vated principally by their desire to
benefit equity rather than the Creditors to whom the Debtors owed
a fiduciary duty"; (3) "the unusually prolonged procedur[al] path
of this litigation[,] caused in substantial part by the actions
of Riker Danzig at the direction of the [Daums]"; and (4) "the
fact that Riker Danzig, again acting at its client's direction,
was an obstacle, not an asset, when it came to approval of the
settlement."  (Transcript of the March 22, 2007 hearing on final
fee applications ("March 2007 Hearing") at 14-15.)


## DISCUSSION

## I.  Standard of review

On appeal, a bankruptcy court's legal conclusions are reviewed de novo, and its findings of fact are set aside only if clearly erroneous.  One Times Square Assocs. Ltd. P'ship v. Banque Nationale de Paris (In re One Times Square Assocs. Ltd. P'ship), 165 B.R. 773, 774-75 (S.D.N.Y. 1994).  A bankruptcy court's decision to award fees and costs is reviewed for abuse of discretion.  Lubow Machine Co., Inc. v. Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp.), 209 F.3d 100, 103 (2d Cir. 2000).

For the review of pre-approved fees, the Bankruptcy Code contains a heightened standard.  A bankruptcy judge may only change a pre-approved fee if the terms and conditions of the fee agreement "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).  As the Fifth Circuit has stated, a bankruptcy court "applie[s] the incorrect legal standard by finding that the circumstances were merely unforeseen; instead, the bankruptcy court should ... determine[] whether developments, which made the approved fee plan improvident, [were] incapable of anticipation at the time the award was approved."  Daniels v. Barron (In re Barron), 325 F.3d 690, 693 (5th Cir. 2003).


**II. Statutory scheme**

Under the Bankruptcy Reform Act of 1978, bankruptcy courts were given the power to pre-approve a lawyer's contingent fee agreement:

> § 328.  Limitation on compensation of professional persons
>
> (a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis.  Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

Section 328 stands in contrast to 11 U.S.C. § 330, which provides that, after notice and a hearing, a court may award "reasonable compensation for actual, necessary services" rendered by the estate's attorneys (and other professionals).  By allowing a bankruptcy court to pre-approve attorneys' fees, rather than calculate the fees after the fact, § 328 makes it easier for the estate's trustee to hire counsel.  Prior to the 1978 act which introduced § 328, "the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the

work was worth after it had been done.  That uncertainty continues under the present § 330 of the Bankruptcy Code, which provides that the court award to professional consultants 'reasonable compensation' based on relevant factors of time and comparable costs, etc.  Under present § 328 the professional may avoid that uncertainty by obtaining court approval of compensation agreed to with the trustee."  Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.), 123 F.3d 861, 862 (5th Cir. 1997).

The Ninth Circuit has observed that "a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328."  Friedman Enters. v. B.U.M. Int'l, Inc. (In re B.U.M. Int'l, Inc.), 229 F.3d 824, 829 (9th Cir. 2000).  On a similar note, the Fifth Circuit has

> interpreted § 328 to limit the power of the bankruptcy
> court to alter the compensation of professionals:  the
> court must ... set the compensation award either
> according to § 328 or § 330.  If prior approval is
> given to a certain compensation, § 328 controls and the
> court starts with that approved compensation, modifying
> it only for developments unforeseen when originally
> approved....  Section 328 applies when the bankruptcy
> court approves a particular rate or means of payment,
> and § 330 applies when the court does not do so....
> Once the bankruptcy court has approved a rate or means
> of payment, such as a contingent fee, the court cannot
> on the submission of the final fee application instead
> approve a "reasonable" fee under § 330(a), unless the
> bankruptcy court finds that the original arrangement

was improvident due to unanticipated circumstances as
required by § 328(a).

Peele v. Cunningham (In re Texas Sec., Inc.), 218 F.3d 443, 445-
46 (5th Cir. 2000) (internal quotation marks and brackets
omitted).


## III. Riker Danzig's fee agreement was pre-approved under § 328

In its cross-appeal, the Committee argues that Riker
Danzig's contingency fee was not pre-approved under § 328.[2]

The Committee points out that neither the bankruptcy court's
November 16, 2000 retention order, nor the annexed Rothschild
Letter, explicitly referred to § 328.  The Committee also points
to cases from the Third, Sixth, and Ninth Circuits, which
developed tests to determine whether a bankruptcy judge has pre-
approved a fee agreement pursuant to § 328.  None of those tests,

---

[2]
The Committee also argues that Riker Danzig, under the terms
of its fee agreement, should not earn any fee whatsoever.
According to the Committee, Riker Danzig has not
demonstrated that its litigation success caused the recovery
from Juno; that, on the contrary, the estate's recovery is
due to a settlement solely engineered by the Committee.
This is a poor argument for several reasons.  First, the fee
agreement was not based on Riker Danzig's litigation
success, but was a commission on funds "obtained from Juno."
(Rothschild Letter at 1.)  Second, the settlement was
negotiated under the threat of litigation by Riker Danzig.
Third, after Riker Danzig's successful efforts to overturn
the first settlement on appeal, the ultimate settlement was
increased by about one fifth (from $5.5 million to $6.5
million).

if applied, would lead to a finding that the bankruptcy court failed to pre-approve the fee agreement under § 328.

The Third Circuit, affirming a bankruptcy court's fee reduction, found that the terms of the fee agreement had not been pre-approved under § 328. <u>Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.</u>, 50 F.3d 253, 261-62 (3d Cir. 1995). Emphasizing "the importance of the precise language of the order authorizing the professional's employment," the court required the retention order to "expressly and unambiguously state specific terms and conditions ... being approved pursuant to the first sentence of section 328(a)." <u>Id</u>. at 261 (citation omitted). The Ninth Circuit found that a fee had not been pre-approved where the bankruptcy court "specifically included the condition that 'all fees and costs ... are subject to Court approval." <u>Friedman</u>, 229 F.3d at 829. Because the bankruptcy court failed to "convey its complete approval" of the fee arrangement, and instead reserved the right to further approve the fees, the Ninth Circuit found that the bankruptcy court had not pre-approved the fee pursuant to § 328. <u>Id</u>. The panel also noted that the bankruptcy court did not "specifically refer[]" to § 328 when it ruled on the application, although that omission was not dispositive.[3] <u>Id</u>.

---

[3]      The Ninth Circuit has also stated that, in order to "ensure that § 328 governs the review of a professional's fees," as opposed to § 330, "a professional must invoke the section explicitly in the retention application." <u>Circle K Corp. v. Houlihan, Lokey, Howard & Zukin, Inc. (In re Circle K.</u>

The Sixth Circuit has stated that "whether a court 'pre-approves' a fee arrangement under § 328 should be judged by the totality of the circumstances, looking at both the application and the bankruptcy court's order.  Factors in the determination may include whether the debtor's motion for appointment specifically requested fee pre-approval, whether the court's order assessed the reasonableness of the fee, and whether either the order or the motion expressly invoked § 328." Nischwitz v. Miskovic (In re Airspect Air, Inc.), 385 F.3d 915, 922 (6th Cir. 2004).

These cases do not stand for the proposition that the retention order must explicitly refer to § 328, although a bankruptcy court's explicit reference to § 328 would, of course, resolve any ambiguity.  Zolfo requires that the retention order explicitly refer to the terms and conditions of the fee proposal being pre-approved.  Friedman requires the bankruptcy court to express advance approval of the fee, rather than reserve final approval to a later time.  Nischwitz looks to the totality of the circumstances to determine whether a fee agreement has been pre-approved pursuant to § 328.  Under any of the above tests, the fee application in this case was approved under § 328.

---

Corp.), 279 F.3d 669, 674 (9th Cir. 2002).  "[U]nless a professional is unambiguously employed pursuant to § 328, its professional fees will be reviewed for reasonableness under § 330." Id.  In this case, Riker Danzig explicitly invoked § 328 in its retention application.  (Application of Debtors-in-Possession for an Order Approving Retention of Special Litigation Counsel, November 7, 2000, at ¶ 7.)

The Committee made the same argument to Judge Peck that it has made to this court.  Judge Peck found as a matter of fact that the fee agreement had been pre-approved:

> I note ... that the order that was entered by Judge Blackshear is silent with respect to the statutory standard applicable to the fee arrangement, although based on my review of the contemporaneous record, it is apparent that the parties contemplated the engagement of Riker Danzig would be an engagement pursuant to Section 328.

(March 2007 Hearing at 11.)  There is no reason to disturb Judge Peck's finding.  It is obvious from the proceedings below that all parties considered the Riker Danzig fee agreement to be an agreement under § 328.  At the approval hearing, the U.S. Trustee objected to the fee agreement on the ground that "the application ... does not provide for an application to be filed pursuant to 330 and 331," and therefore "the application won't be subject to reasonableness under 330, and 331 and the guidelines."  (November 2000 Hearing at 25, 26.)  The bankruptcy judge responded, "[c]ontingency fee means that the attorney must be successful in order to be paid," and that "if he doesn't bring in anything, he doesn't get paid at all.  As to where [we would be] if he was under 330 or 331 we would be liable for his daily time charges....  Then that way, he would be entitled to a fee whether he was successful or not."  Id. (emphasis added).  The court understood that the fee application was being approved pursuant to § 328 and not § 330.  Furthermore, Smart World sought "to

retain the law firm of Riker, Danzig ... as their Special Counsel
... pursuant to 11 U.S.C. §§ 327 and 328."  (Application of
Debtors-in-Possession for an Order Approving Retention of Special
Litigation Counsel, November 7, 2000, at ¶ 7.)  The U.S. Trustee
objected, on the ground that a § 328 approval "would allow the
applicant a super-priority administrative claim in an amount that
may not be reasonable pursuant to 11 U.S.C. §§ 330 and 331."
(Objection of the United States Trustee to Application for Order
Authorizing Retention of Riker Danzig, November 9, 2000, at 1-2.)

Therefore, § 328 applies, and the fee award to Riker Danzig
may only be reduced if the fee agreement's "terms and conditions
prove to have been improvident in light of developments not
capable of being anticipated at the time of the fixing of such
terms and conditions."  11 U.S.C. § 328(a).

## IV. No developments below were incapable of being anticipated

A bankruptcy court "may not award a fee different from one
that it has approved in a retention order unless it finds that
the terms in the retention order were 'improvident in light of
developments not capable of being anticipated at the time....'"
Howard v. High River Ltd. P'ship, 369 B.R. 111, 117 n.8 (S.D.N.Y.
2007) (quoting 11 U.S.C. § 328(a)).

There is wide agreement that unanticipated events are not grounds for revisiting a pre-approved fee award. The events must be "not capable of being anticipated." Several courts, reversing fee reductions by bankruptcy judges, have commented on the distinction between unanticipated events and events not capable of anticipation. In Daniels v. Barron (In re Barron), the bankruptcy court had reduced a pre-approved fee because of the unanticipated "substantial amount of the subsequent recovery." 225 F.3d 583, 586 (5th Cir. 2000) (citation omitted). The district court affirmed. The Fifth Circuit reversed, stating that "[t]he bankruptcy court here should have relied upon the plain language of the statute.... It is not enough that the developments were simply unforeseen." Id. In In re Gilbertson, the bankruptcy court had reduced a pre-approved fee because the settlement had been much easier than anticipated. No. 06-C-610, 2007 WL 433096, at *1 (E.D. Wisc. Feb. 4, 2007). The district court reversed, ruling that an easy settlement "might have been unanticipated (by the court and/or by [the lawyer]), but that is not the test.... When counsel is successful, the contingent fee can appear excessive in hindsight, but early success by counsel is always a possibility capable of being anticipated." Id. at *5. In Houlihan, Lokey, Howard & Zukin Capital, Inc. v. Northwestern Corp. (In re Northwestern Corp.), the bankruptcy court had reduced by 50% the pre-approved fees of two financial

advisors because the advisors provided duplicative services.  332
B.R. 534, 537 (D. Del. 2005).  The district court reversed,
finding that "whether or not those services were inappropriately
duplicative, the potential for duplication was certainly not
unforeseeable."  Id.  In Seiler v. First Nat'l Bank of Babbitt
(In re Benassi), the bankruptcy court found the pre-approved fee
to be too large, given the small number of hours worked.  72 B.R.
44, 46 (D. Minn. 1987).  The district court reversed, finding
that it was not an "unforeseeable and unexpected circumstance[]"
that the fee exceeded what would have been charged under a
billable hours arrangement.  Id. at 49.

In this case, the bankruptcy court cited four developments
that made the fee terms improvident.  None of these developments
meet the high standard of § 328(a), since all of them were
capable of being anticipated.

The first development was that "divergent positions
regarding litigation and settlement strategy ... developed
between the Debtor and the Committee."  (March 2007 Hearing at
14.)  The bankruptcy court found it impossible to anticipate "the
resulting extreme antagonism, animosity and demonstrable lack of
cooperation" between the parties.  Id.  However, animosity
between Riker Danzig and the Committee was not unforeseeable.  As
the Third Circuit has observed, "some degree of antagonism and
animosity between a debtor and creditor can be expected in any

17

bankruptcy proceeding." <u>In re Marvel Entm't Group</u>, 140 F.3d 463, 474 (3d Cir. 1998).

The bankruptcy court also cited, as a development not capable of being anticipated, "the unusually prolonged procedur[al] path of this litigation[,] caused in substantial part by the actions of Riker Danzig at the direction of the [Daums]." (March 2007 Hearing at 15.) The length of the litigation was in part caused by Judge Blackshear's nearly two-year stay of the adversary proceeding, and in part caused by the appeal of the first settlement. The stay of the adversary proceeding and the appeal to the Second Circuit were foreseeable. The fact that Riker Danzig won in the Second Circuit further supports the foreseeability of the procedural path of the litigation; it is foreseeable that a party with a strong case will appeal.

The bankruptcy court also found it unforeseeable that Riker Danzig took "instructions directly from the [Daums], who seemed to be [inner]vated principally by their desire to benefit equity rather than the Creditors to whom the Debtors owed a fiduciary duty"; and that "Riker Danzig, again acting at its client's direction, was an obstacle, not an asset, when it came to approval of the settlement." (March 2007 Hearing at 15.)

The Second Circuit's opinion in this case refutes the argument that the Daums' pursuit of litigation and their

objection to settlement were unforeseeable. "As fiduciary, the debtor bears the burden of maximizing the value of the estate, including the value of any legal claims. Courts have thus concluded that in some instances, fiduciary duty requires the chapter 11 debtor to pursue a cause of action, but in other instances may require settlement." Smart World, 423 F.3d at 175 (internal quotation marks, citations, and alteration omitted). Although the bankruptcy court found it unforeseeable that the Daums would be "[inner]vated principally by their desire to benefit equity rather than the Creditors to whom the Debtors owed a fiduciary duty" (March 2007 Hearing at 15), the Daums' desire to pursue the litigation against Juno was not unforeseeable. As the Second Circuit stated, "Smart World's pursuit of its adversary claims ... subjected the bankruptcy estate to no risk," due to the contingency fee arrangement with Riker Danzig, "while allowing the estate to reap any potential award." Id. at 180. Finally, the bankruptcy judge did not find that there had been a violation of the fiduciary duty owed by debtors-in-possession to the estate's creditors.

Accordingly, the bankruptcy court's reduction of Riker Danzig's contingency fee award is reversed. The fee reduction was not within the narrow range of fee adjustments allowed by 11 U.S.C. § 328(a), and therefore the reduction of Riker Danzig's

fee award was an abuse of the bankruptcy court's limited discretion.

## V. The fee award

Riker Danzig sought a fee of $2,320,959.02, plus expenses of $78,489.13 (later reduced, voluntarily, to $73,981.18).  Riker Danzig calculated its fee as follows:  1/3 of the first $1.5 million over expenses, plus 37% of the remaining $4,921,510.87. Riker Danzig's calculation was in error.

The fee agreement provides that the fee shall be determined as follows:

> 1) Riker Danzig will be paid all expenses off of the top [of] any recovery and, after payment of expenses, will receive 33-1/3% of the first $1,500,000 obtained from Juno; 2) Riker Danzig's share of funds in excess of $1,500,000 but less than $8 Million will be (a) 0% if the litigation lasts less than 6 months, (b) 10% if the litigation lasts from 6 months to 9 months, (c) 20% if the litigation lasts between 9 months and 12 months, (d) 37% if the litigation lasts more than 12 months; and 3) Riker Danzig will receive 37% of all funds received in excess of $8 Million.  Finally, Riker Danzig's fee for any monies received after 18 months shall be 33 1/3%.

(Rothschild Letter at 1-2.)  The final sentence clearly states that Riker Danzig's fee for any monies received after 18 months of litigation shall be 33 1/3%, not 37%.  Riker Danzig interprets the final sentence by reading it together with the prior sentence, arguing that a "recovery from amounts over $8,000,000 [would be] reduced to one-third if the litigation continued for

more than eighteen months," but "[s]ince the settlement approved
in the Plan was less than $8,000,000, these provisions are
irrelevant here."  (Appellant's Brief at 9 n.2.)

Riker Danzig's interpretation is strained.  The final
sentence clearly applies to the entire fee award, and reduces the
fee to one-third if the litigation persists for more than
eighteen months.  The record supports this interpretation.  The
bankruptcy court rejected the first fee agreement because the
agreement contained no incentive to settle quickly.  The court
held a subsequent hearing after the parties modified the fee
agreement to provide such an incentive.  The discussion of the
modified fee agreement was as follows:

> MR. TABACHNIK [counsel to Debtor-in-Possession,
> speaking about the agreement with Riker Danzig]:  They
> always get thirty-seven percent of amounts over $8
> million.
>
> THE COURT:  At any time?
>
> MR. TABACHNIK:  At any time.
>
> MS. MAYERSON [creditor's counsel]:  That's not
> correct.
>
> MR. TABACHNIK:  Except after eighteen months.  That
> number goes down to thirty-three percent so the
> incentive for them is to settle this within the first
> 18 months.

(November 2000 Hearing at 20.)

Therefore, Riker Danzig no longer qualifies for the 37%
contingency fee.  Riker Danzig's expenses are $73,981.18, taken

off the top of $6,500,000.00, and its fee award is $2,142,006.27, i.e., one-third of the remaining $6,426,018.82.

CONCLUSION

For the foregoing reasons, the fee award of the bankruptcy court is reversed and remanded for entry of judgment in the amount of $2,215,987.45, the total of $73,981.18 in expenses and a fee award of $2,142,006.27.

SO ORDERED.

Date:    New York, New York
         March 19, 2008

                          S/_____
                              MIRIAM GOLDMAN CEDARBAUM
                              United States District Judge